GUADALUPE–BLANCO RIVER AUTHORI-
TY et al. v. TUTTLE et al., Board of
Trustees.

No. 11278.

Court of Civil Appeals of Texas.
San Antonio.

March 3, 1943.

Rehearing Denied May 12, 1943.

E. M. Cape and Tom G. Oliver, Jr., both of San Marcos, Fred L. Blundell, of Lockhart, and A. J. Wirtz, W. S. Gideon, and D. W. Glasscock, all of Austin, for appellants.

S. J. Brooks, W. L. Matthews, and W. F. Nowlin, all of San Antonio, for appellees.

PER CURIAM.

This is an appeal from an order granting a temporary injunction based upon the application of the members of the "Board of Trustees" of the San Antonio Electric and Gas System appointed and created by an ordinance of the City of San Antonio passed in accordance with Article 1115, Vernon's Ann.Civ.Stats. This ordinance incorporated therein a certain contract between the City of San Antonio and Harris Trust and Savings Bank of Chicago and Harold Eckhardt, Trustee, of Evanston, Indiana, representing the prospective pur-

chasers of revenue bonds of the issue also authorized by the ordinance.

The Board of Trustees which filed this suit consisted of W. B. Tuttle, Walter P. Napier, D. F. Youngblood, Franz C. Groos and C. K. Quin, who, as Mayor of the City of San Antonio, was ex officio a member of said Board.

The defendants below were the City of San Antonio, a home rule city and a municipal corporation, Guadalupe-Blanco River Authority and Lower Colorado River Authority, conservation and reclamation districts, created by special acts of the Legislature of the State of Texas.

The basis of the Board's complaint insofar as the temporary injunctive relief sought is the alleged want of authority on the part of the contracting parties, and the invalidity or illegality of a portion of a contract entered into by and between said City of San Antonio and the Guadalupe-Blanco River Authority, whereby said City leased to said Authority a steam generating electric plant located and situated in Comal County, Texas, in and near the City of New Braunfels, for a period of thirty years, coupled with an option to purchase at the end of the lease period. This contract was assigned by the Guadalupe-Blanco River Authority to the Lower Colorado River Authority.

From the order granting the temporary injunction the two Authorities have prosecuted this appeal.

We have concluded that the order appealed from must be reversed and the temporary injunction vacated for the reason that the Board of Trustees is not such a party or entity as may assert in this cause the contentions upon which the temporary injunction is necessarily based.

It is made certain by their petition and by their testimony that, as plaintiffs, the members of the Board of Trustees do not sue as individuals, nor as citizens or taxpayers of the City of San Antonio, nor in behalf of said City, nor in behalf of the holders of the revenue bonds of the City, issued in accordance with the terms of the ordinance which also created the Board of Trustees, nor in any other capacity than as members of said Board.

The powers and duties of the Board of Trustees were fixed and are therefore limited by the express or necessarily implied provisions of the contract contained in the ordinance mentioned. Those provisions

are, simply and ultimately, that the appointed Board of Trustees shall control, manage and operate the purchased utility system until the revenue bonds issued for the purchase thereof shall have been fully paid. Although the details and manner of the performance of its duties are left largely to the discretion of the Board, it is clear that its powers are also derived from and consequently dependent upon the provisions of the contract contained in the ordinance. Beyond the powers and duties therein conferred the Board cannot go.

No character of title to the purchased properties is vested in the Board under the contract, or by the statute authorizing said contract, Article 1115, supra. Title to the system is held by the City, subject only to the lien thereon securing the payment of the purchase price revenue bonds. The Board is given no express authority as a Board of Trustees to sue or be used in connection with their management of the system, and the power to maintain as a "Board of Trustees" or members of a "Board of Trustees," the demands upon which injunctive relief granted in the lower court was based can not be implied from the mere power to control and operate the property in behalf of its owner, the City of San Antonio. The members of the Board are agents of the City, and their authority is limited to that conferred by the contract of their creation and appointment. Sifford v. Waterworks Board of Trustees, Tex.Civ.App., 70 S.W.2d 476, writ refused; San Antonio Independent School District v. Waterworks Board of Trustees, Tex.Civ.App., 120 S.W.2d 861, writ refused.

The Board of Trustees in this suit do not purport to maintain that part of the asserted cause of action upon which the temporary injunction is based in the name of or on behalf of the City of San Antonio or the holders of its revenue bonds.

The cited cases of Sifford v. Waterworks Board of Trustees and San Antonio Independent School District v. Waterworks Board of Trustees, supra, involved the legal status and powers of the Waterworks Board of Trustees of the City of San Antonio. We have examined the record in the first mentioned case, which is on file in this Court. From that examination we find that the powers of that Board were conferred by the same processes as those by which appellees' powers were conferred, and that those powers are substantially the

same. In the Sifford case the plaintiff sued the Waterworks Board for damages sustained through alleged negligent operation of the Waterworks System by the Board. The trial court sustained the general demurrer to plaintiffs' petition because suit cannot be maintained against the Water Works Board of Trustees and the Trustees thereof as such." [70 S.W.2d 477.]

This Court, in an opinion by Chief Justice Fly, approved the ruling of the trial court. In the opinion it was said that: "There was, however, no allegation that the water board was a separate entity from the city, or that it had been chartered by the state, but all of the allegations tend to show that the water board was merely a department and agency of the city to take charge of and operate for the city its water system, just as the departments of the fire and police were created for the purposes of obtaining protection from fire and protection from criminals violating the laws. The property is owned by the city, and the department of water is as much under the control and management of the city, through its trustees, as is the department of taxation, streets, police, and fire, except in some particulars stated in the deed of trust. It has been definitely settled by the decisions of different states of the Union that departments of the city created and acting in a similar way to that of the water board of the city of San Antonio could not be held liable for debt or tort, but that the city, if any one, was the party liable under such claims." Citing numerous authorities.

From what has been said, it follows that the order appealed from must be reversed and the temporary injunction vacated. However, said temporary injunction will be continued in force pending our disposition of motion for rehearing. Should no motion be filed our order vacating the injunction will become effective on March 19, 1943.

## On Motion for Rehearing.

MURRAY, Justice.

The majority of the Court adheres to the original opinion, because to do otherwise would be to overrule Sifford v. Waterworks Board of Trustees, Tex.Civ.App., 70 S.W. 2d 476, and San Antonio Independent School District v. Waterworks Board of Trustees, Tex.Civ.App., 120 S.W.2d 861, in both of which cases the Supreme Court refused a writ of error.

However, in deference to the dissenting opinion of Chief Justice Smith, we have deemed it proper to discuss other phases of the case. The temporary injunction should be set aside because the petition therefor fails to allege an irreparable injury and likewise the proof fails to show any such irreparable injury. The "Board of Trustees" are in possession of the "Comal Plant"—no one is attempting by unlawful means or force to interfere with their possession—and if they feel that it is their duty not to surrender the possession of such plant then all they have to do is to simply continue in possession of the same. The evidence shows that the same competent individuals will operate the plant whether it is theoretically in the possession of the "Board of Trustees" or of the Colorado River Authority, that the books are being so kept that regardless who should be ultimately shown to be entitled to operate the plant an accounting can easily be made. Under such circumstances there is no showing which will justify the harsh remedy of a temporary injunction.

Furthermore, a fair construction of all the instruments having a bearing upon the deal show that the Board of Trustees are not entitled to hold possession of the Comal Plant, and that it is under the record as shown here their duty to deliver the same to the Colorado River Authority.

The purchase of the property of the San Antonio Public Service Company, the sale of the revenue bonds (whereby the purchase money was provided), the lease of the Comal Plant to the Guadalupe-Blanco River Authority, and the sub-leasing of the same to the Colorado River Authority, are one simultaneous transaction. It is true that the "Indenture" was contained in an ordinance passed some time before the deal was closed and it is also true that an executory contract for the purchase of the property of the San Antonio Public Service Company and an executory contract for the sale of the revenue bonds were executed prior to the closing of the deal, but the Guadalupe-Blanco River Authority had certain suits pending against the City of San Antonio and the Attorney General of Texas very properly refused to approve the revenue bonds until all litigation was dismissed. The bonds could not be sold until the Attorney General gave his approval. The deal could not be closed until the City got the money for the bonds. The Guadalupe-Blanco River Authority

would not dismiss its suits unless the City would lease to them the Comal Plant. Thus the deal was simultaneously closed. The City entered into the lease contract with the Guadalupe-Blanco River Authority, the Authority dismissed its suits, the Attorney General approved the bonds, the brokers purchased the bonds and delivered the money to the City, the City paid the money to owners of the property, known as the San Antonio Public Service Company Gas and Electric System, the property was delivered to the City and by the City delivered to the Board of Trustees, with instructions to deliver the Comal Plant to the Colorado River Authority, in keeping with the provisions of the lease contract with the Guadalupe-Blanco River Authority. Thus we have one simultaneous transaction with each instrument involved being of equal dignity with every other instrument.

But appellees contend that there is a conflict between the provisions of the "Indenture" and the "Lease Contract" and that this conflict should be decided in favor of the "Indenture." The alleged conflict is based upon the following provision of the "Lease Contract": "Sec. 2. The provisions of this Agreement are recognized and declared to be subject to all of the terms of that certain indenture dated August 1, 1942, by and between the City of San Antonio and Harris Trust and Savings Bank and Harold Eckhart, as trustees, in all respects with like force as though the bonds secured by said indenture had been delivered and outstanding on the date of the execution of this agreement, and if any provision or provisions hereof or the obligation of the City hereunder shall be determined by any court of competent jurisdiction to be in conflict with any terms which may appear in said indenture, the trustees under such indenture (Harris Trust and Savings Bank and Harold Eckhart) may enforce the provisions thereof as if the conflicting provision or provisions of this contract were void. All rights and remedies given bondholders by said indenture shall be fully enforceable against the leased properties, and if default shall ever occur in the payment of either principal or interest or any of the bonds secured by said indenture, all rights and remedies provided in said indenture may be enforced as if this agreement had automatically terminated and become void. * * *"

If this paragraph is given the effect contended for by appellees, it will render the other provisions of the lease meaningless and in effect nullify the entire "Lease Contract." In construing contracts the intention of the parties is the determining factor. Certainly the parties did not write a lease contract of many pages, going into the most minute and particular provisions as to how the lease should be effected, and then by one vague and uncertain paragraph intend to wipe out all they had written.

There is another cardinal principle governing the construction of contracts which here applies. Where two contracts of equal dignity are in apparent conflict, it is the duty of the courts in construing such contracts to give to each such a construction, if possible to do so, that each may stand and that each may have effect.

When these cardinal principles of the construction of contracts are here applied, it becomes plain that what was intended by the parties was that the "Lease Contract" should in no way impair the lien securing the revenue bonds provided in the "Indenture."

We are not here called upon to pass upon whether the "Lease Contract" was a good deal or a bad deal for the City. Whether or not the "Lease Contract" should have been entered into was a matter addressed to the discretion of the Mayor and City Commissioners of the City of San Antonio. There is no attempt here to show fraud, mistake or overreaching on the part of any one, and if the contracts were legally executed and are not in hopeless conflict they should be upheld.

Appellees' motion for a rehearing is overruled.

The temporary injunction will be continued in effect for thirty days to enable appellees to apply to the Supreme Court for a writ of error herein.

NORVELL, Justice (concurring).

The City of San Antonio and the Guadalupe-Blanco River Authority, on October 24, 1942, entered into a written contract which provided that the River Authority should have a lease upon the "Comal Plant" coupled with an option to purchase the same in accordance with the terms of the contract. The "Comal Plant" was conveyed to the City by the San Antonio Public Service Company, a private corporation (acting by trustees in dissolution), along

with other property, on October 24, 1942. The City of San Antonio-G. B. R. A. agreement recited that: "The City of San Antonio has entered into a contract and has formulated a plan under which it proposes immediately to acquire all of said electric properties (owned by San Antonio Public Service Company) except electric distribution properties serving the cities of New Braunfels, Hondo and Boerne, and territory immediately adjacent thereto, subject to the rights, privileges and agreements conferred on the Authority under the terms and provisions of this contract."

If the above provision be valid, it necessarily follows that the City received title to the property from the San Antonio Public Service Company burdened with the contractual rights or interests of the Guadalupe-Blanco River Authority evidenced by its contract with the City.

The contract between the City and the River Authority further provided that the term of the Authority's lease should begin on November 1, 1942. Therefore, if the agreement be valid, the possession of the "Comal Plant" by the City or by the appellees as a Board of Trustees was limited to a period of seven or eight days.

It is clear that the question of whether or not appellees, the Board of Trustees, should have turned the Comal Plant over to the River Authority or its assignee on November 1, 1942, depends entirely upon the question of the validity of the contract entered into between the City and the Guadalupe-Blanco River Authority on October 24, 1942.

This then is a suit (insofar as the injunctive feature thereof is concerned) which has for its purpose the avoidance of a municipal contract and the recovery of property owned by the City which has been conveyed away by an allegedly invalid or illegal contract.

It is well settled that a person must have a litigable interest in the subject matter of a suit in order to maintain the action. For instance, if A and B make a contract and adopt a certain interpretation thereof in carrying it out, C, a third party, may not maintain a suit to compel A and B to adopt a different construction of the contract. Generally speaking, some right of C, usually a property right, must be affected by operations under the contract before he may litigate over its construction.

This principle which demands the presence of a litigable interest in a plaintiff is applicable to suits involving municipal corporations, their contracts or properties. City of San Antonio v. Strumberg, 70 Tex. 366, 7 S.W. 754; Fisher v. City of Bartlett, Tex.Civ.App., 76 S.W.2d 535.

The contention of appellees that they have such an interest as entitles them to maintain a suit to avoid a municipal contract and recover municipal property is based upon some sort of trust theory. Although the books contain numerous decisions dealing with legal controversies involving municipal contracts, in which the question of the existence of a litigable interest is discussed, appellees have not, to my mind, cited an authority having to do with the law of municipal corporations which supports their position. In this field and in connection with the question of the existence of a litigable interest, it seems that the only "trust theory" having support in the authorities is that which regards the municipal corporation as a trustee for and in behalf of its citizens, in much the same way as a private corporation is regarded as a trustee for and in behalf of its stockholders. In certain kinds or types of litigation, when the authority vested with the right (generally by charter) to institute or maintain legal actions for and on behalf of the corporation fails to do so, the stockholder (of the private corporation) or the citizen or taxpayer (of the municipal corporation) may maintain a suit. This theory need not be here discussed at length. Dillon on Municipal Corporations, a standard text authority, contains a full and complete analysis of the matter. See IV Dillon, 5th Ed., Chapter XXXI, pp. 2746–2806, particularly §§ 1579, 1580, 1586, 1587 and 1588. It is sufficient to say here that this theory or rule is based upon the proposition that the plaintiff occupies the position of a cestui que trust and the municipal corporation is regarded as a trustee.

This suit was seemingly instituted on rather the converse of the theory stated, i. e., that appellees are trustees, and that the City, the bondholders, or the public at large are the cestuis que trustent.

Since the term "trustee" has a popular as well as legal definition, the two should not be confused. Popularly speaking, a trustee is one who is trusted or one in whom confidence is reposed. In Article 1115, Vernon's Ann.Civ.Stats., the term "board of trustees" is obviously used in its popular sense. Legally speaking, a trust exists when one person, natural or arti-

ficial, holds the legal title to property for the benefit of and subject to the equitable rights of another. 65 C.J. 212.

In the legal sense, the appellees are not trustees at all. As a board they constitute a department and agency of the City to take charge of and operate for the City its gas and electric system. Sifford v. Waterworks Board of Trustees, Tex.Civ.App., 70 S.W.2d 476.

In the American Law Institute's "Restatement of the Law," it is stated that: "an agency is not a trust. * * * A trustee has title to the trust property; an agent as such does not have title to the property of his principal, although he may have powers with respect to it. * * *" Restatement of the Law, Trusts, Vol. 1, p. 28, § 8.

The appellees here are not the owners of the property involved, nor do they hold the legal title thereto.

In my opinion the original disposition of this appeal was correct. Appellees not being trustees cannot as trustees challenge the validity of the City's contract. Further, appellees have not pleaded that they occupy the position of cestuis que trustent with reference to the property involved, and that the City as trustee has failed and refused to act.

I think we need go no further. The principle which demands that a plaintiff have a litigable interest in order to maintain a suit is based upon a sound public policy. Existing rules by which the existence of a litigable interest may be determined seem adequate and in accordance with correct legal theory. The application of these rules necessitates a reversal of the trial court's decree.

I concur in the majority opinion prepared by Associate Justice MURRAY.

SMITH, Chief Justice (dissenting).

It is provided in Ch. 10, Title 28, Vernon's Tex.Civ. Stats., and particularly in Art. 1111, that cities such as the City of San Antonio "shall have power to build and purchase, to mortgage and encumber their light systems, * * * or natural gas systems, * * * and the franchise and income thereof and everything pertaining thereto acquired or to be acquired and to evidence the obligation therefor by the issuance of bonds, * * * and to secure the payment of funds to purchase same * * *. No such obligation of any such system shall ever be a debt of such city or town, but solely a charge upon the properties of the system so encumbered, and shall never be reckoned in determining the power of any such city or town to issue any bonds for any purpose authorized by law."

Article 1115 reads as follows:

"Art. 1115. Control

"The management and control of any such system or systems during the time they are encumbered, may by the terms of such encumbrance, be placed in the hands of the city council of such town, or may be placed in the hands of a board of trustees to be named in such encumbrance, consisting of not more than five members, one of whom shall be the mayor of such city or town. The compensation of such trustees shall be fixed by such contract, but shall never exceed five per cent of the gross receipts of such systems in any one year. The terms of office of such board of trustees, their powers and duties, the manner of exercising same, the election of their successors, and all matters pertaining to their organization and duties may be specified in such contract of encumbrance. In all matters where such contract is silent, the laws and rules governing the council of such city or town shall govern said board of trustees so far as applicable."

By appropriate procedure and in accordance with the statutes, the City of San Antonio through its Board of City Commissioners on July 25, 1942, contracted to purchase the complete gas and electric systems of San Antonio Public Service Company serving the City of San Antonio and its environs, and on August 24th issued and contracted to sell revenue bonds in the amount of $33,950,000 and apply the proceeds thereof to payment in full of the purchase price of said utilities. Payment of the principal and interest on the bonds was amortized over a period of thirty years.

Under the provisions of Art. 1115, as applied to this case, the City and the bondholders were given the option of delegating the administration of the City's gas and electric system to the Board of City Commissioners, on the one hand, or to a Board of Trustees, consisting of resident citizens such as appellees, on the other. Ordinarily a City cannot lawfully barter away its inherent power of possession, control and administration of its public utilities, but that power of delegation is expressly conferred in Art. 1115, concededly a valid statute, when exercised in accord-

526

ance with that statute, and has been actually exercised in this case through admittedly valid ordinances and by an admittedly valid contract. For, also on July 25, 1942, in pursuance of the provisions of Art. 1115, the City, through its Board of Commissioners, entered into a contract of indenture with the trustees of the purchasers of the revenue bonds. In that indenture the parties elected to and did thereby place the purchased utility systems in the possession and exclusive control of a Board of Trustees therein created and named, for the purpose of administration. And while in that indenture the City retained the bare legal title to the purchased properties and the bondholders reserved a lien thereon to secure payment of the bonds, the right of complete and exclusive possession, control and management thereof was vested in the named Board of Trustees, to be operated by them during the life of the encumbrance, which they were to discharge out of current revenues from the properties. The creation and appointment of the Trustees, and the delegation of exclusive control to them, was accomplished in the indenture and under express sanction of Art. 1115, the obvious no less than wise purpose of which was to protect the public interest from the hazards of political and other selfish influences which so often impair and sometimes destroy the usefulness of governmental projects. Under the terms of the indenture the Board of Trustees was made self-perpetuating for its duration through provision that vacancies occurring in the membership should be filled by the remaining or surviving members, thereby further securing the Board, as trustees for the public, from interference by influences inimical to the public interest. It is true that powers were given the parties to the indenture to change the method and agency of administering the systems, but this power was well safeguarded from abuse and has not been exercised, so that the exclusive power and duty of administration still vest in the duly created board of trustees, and are not questioned here.

Now, the electric system purchased by the City from San Antonio Public Service Company embraced all related properties of the latter company, with certain specific exceptions not material here. It included, specifically, what is known as the "Comal Plant," which is the bone of contention in this litigation. The Comal Plant was a part of the electric system acquired by the City from San Antonio Public Service Company. It was actually delivered to the City by that Company in consummation of the deal therefor between the two, and in accordance with the provisions of the indenture based upon such purchase and sale. And, moreover, the Comal Plant was in turn delivered by the City to the Board of Trustees, as a part of the "complete" electric system, upon their assumption of the duties and obligations of their office under the indenture on October 24, 1942.

The electric power for operating the system originates from two generating plants, one located in the City of San Antonio and the other, the Comal Plant, in the City of New Braunfels. The Comal Plant, however, is the chief source of the supply, without which the system could not function in the absence of alternative sources not available. It is an integral and important, even essential, part of the "complete" system purchased by the City at a cost of $7,000,000, and delivered to the Board of Trustees on October 24, 1942, under the provisions of the indenture executed on July 25, 1942.

Contemporaneously with the delivery of the electric system (including the Comal Plant) to the City by the Public Service Company and in turn by the City to the Board of Trustees on October 24, 1942, the revenue bonds (which were sold on August 24, 1942) were delivered to the purchasers, as provided in the indenture, whereby all the rights, duties and obligations of the City, the trustee for the bondholders and the Board of Trustees, were fixed in accordance with the provisions of the indenture executed on July 25, 1942.

But, also contemporaneously with those events, on October 24th, the Board of City Commissioners, acting for the City of San Antonio, entered into a collateral contract with the Guadalupe-Blanco River Authority whereby the City leased said Comal Plant to said Authority for a period of thirty years, with an option to purchase the Plant at the end of the lease period. As consideration for the lease Guadalupe-Blanco River Authority agreed to pay the City an annual rental of $262,581, with a reciprocal obligation on the part of the City to subscribe for a stipulated amount of electric power generated by the Plant and pay for that amount of power (whether the system actually took or used all or any part thereof) the sum of $270,000 per year throughout the thirty year period.

The effect of those considerations ,was that the City as lessor was to pay the Authority as lessee the net sum of $7,419 annually over a period of thirty years for the bald privilege of leasing its $7,000,000 Comal Plant to the Authority during that period, plus an option to the Authority to purchase the Plant at the end of the lease period for a conjectural price determinable by an arbitrary formula by which the amount was to be computed at that remote date.

It was provided in the lease and option contract that it should become effective on November 1, 1942, which was seven days after the system, including the Comal Plant, was delivered to the Board of Trustees in pursuance of the contract of indenture. The lease and option contract was not executed by the trustee for the bondholders, the second party to the indenture, the City of San Antonio being the first party thereto.

At the time the lease and option contract was executed, and as a part of the same transaction, Guadalupe-Blanco River Authority assigned the contract to Lower Colorado River Authority, in consideration of which the latter obligated itself to pay Guadalupe-Blanco River Authority the sum of $250,000 annually, plus a substantial part of the revenues to be derived from the operation of the Plant by the assignee, throughout the thirty-year period. The City of San Antonio, through its Board of Commissioners, was a party to the lease and assignment, but both lease and assignment, by express stipulation, were made subject to the prior indenture, in which it was provided that the entire system, including the Comal Plant, should be delivered to and administered by the Board of Trustees.

Under authority of the assignment to it of said lease and option contract, Lower Colorado River Authority on November 1st demanded of the Board of Trustees that they surrender possession and control of the Comal Plant to that Authority. The Board of Trustees refused the demand and brought this suit against Guadalupe-Blanco River Authority and Lower Colorado River Authority, praying for a judicial construction of the Board's relevant powers, authority and duties under the terms of the indenture, and for a determination of their right to continue possession and control of the Comal Plant, notwithstanding the lease-option contract, and, in-

cidentally, for a temporary injunction restraining the Authorities from interfering with the Board's possession and control pending a determination of this suit. The trial court granted the injunction as prayed for, and the two Authorities have brought this appeal.

In the original disposition this Court, all concurring in a per curiam opinion, dissolved the temporary injunction granted below, upon the ground that appellees, constituting the members of the Board of Trustees, had no right, in such capacity, to maintain the suit. Upon reconsideration on appellees' motion for rehearing, I find myself unable to adhere to the conclusions expressed in the original opinion or in the decision based on those conclusions.

Under the terms of the indenture, which constituted the charter of their rights, powers, duties and obligations, the Trustees were granted the exclusive power, and it was made their duty, to take and retain possession of and administer the electric system for the duration of their tenure as trustees. Accordingly, the complete system, including the Comal Plant, was delivered by the City to the Trustees on October 24, 1942.

In the indenture the Board of Trustees were given, specifically, the right and duty to fix and collect consumer rates to be charged the public for the use of electricity to be supplied from the system; to collect all revenues to be derived from the operation of the system, impound them in depositories of their own selection, and apply and disburse them in the Trustees' own judgment and discretion, subject, of course, to their obligation to pay off the principal and interest on the revenue bonds as they accrued.

Now, as has been shown, in the lease-option contract the Electric System was required to subscribe for a fixed amount of electric power from the Comal Plant and to pay the Authority for that amount currently throughout the thirty-year period of the lease, regardless of whether that amount or any part of it was actually taken or used by the system. It was a fixed charge based on an inflexible rate per kilowatt. By this provision, if enforced, the Trustees, vested in the contract of their creation with exclusive possession, control and operation of the system and its facilities, were not only divested of possession of the essential Comal Plant, but were perpetually deprived of the right necessarily

incident to their inherent power of control and management, of the free use of the system's own generating plant, and of the right of bargaining for or selecting any other source, as well—throughout their entire tenure of office as trustees.

Moreover, in the indenture the Trustees were vested with the contractual power and duty of fixing rates to consumers of electricity to be supplied from the system, and upon that duty was superimposed the higher public duty of adjusting and re-adjusting those rates to the lowest current levels consistent with honest and intelligent operation of the public utility. But the provisions of the lease contract, if enforced, would bind the Trustees to subscribe to the River Authorities for a major portion of the electric power essential to the operation of the system during the next thirty years and pay the rate arbitrarily fixed in the lease contract, regardless of whether the product subscribed for or any part of it was actually used by the Trustees in operating the system; regardless of whether the arbitrary rate was more expensive to the system than if the product was generated by its own Comal Plant, and regardless of the possibility, if not the more likely probability, that existing and changing conditions would enable the Trustees from time to time to get the same service from other sources at a materially lower rate than that arbitrarily and perpetually fixed in the lease contract. These alternative benefits and advantages are made obvious by the fact that contemporaneously with the execution of the lease and option contract Guadalupe-Blanco River Authority assigned the contract to Lower Colorado River Authority for a consideration of $250,000 a year plus a very substantial share in the revenues to be derived by Lower Colorado River Authority from its operation of the Comal Plant under the lease. And, further, under the lease agreement the Trustees would be prohibited from exercising their inherent power and performing their inherent duty to the public of adjusting and re-adjusting and lowering consumer rates to be exacted of the public for use of the products of this public utility system. These observations are not made or intended to bear upon the question of the validity of the lease and option contract, which is not now before this Court, but only to point out the problems of the members of the Board of Trustees when they were confronted with

a demand for possession of the Comal Plant from strangers to the contract of indenture which created the Board, defined their powers and duties, and described the properties, including specifically the Comal Plant, which they were to administer and which were actually delivered into their possession under the terms of the indenture.

The primary question here is whether or not the Trustees have the right to maintain this suit to enjoin the Authorities from interfering with the Trustees' possession and control of the Comal Plant.

The City of San Antonio has the legal title to the properties involved, subject to the lien of the bondholders. Those parties executed the indenture, under the sanction of Art. 1115. In that indenture they divested themselves of, and invested the Board of Trustees with, complete and exclusive possession, control and management of those properties, to the exclusion of the City and bondholders, for a period of thirty years, with the exclusive power and duty of operating the properties and paying off the bonds with the proceeds of the operations. The Trustees are confronted with a demand from Guadalupe-Blanco River Authority and Lower Colorado River Authority, who are strangers to the indenture, for possession and control of an essential part of the system. It is conceded that the Authorities had no rights in the property under the indenture from which the Board of Trustees derived exclusive authority and control over the "complete" electric system, including specifically the Comal Plant. Whatever interest, if any, the Authorities had they acquired under a collateral contract executed by the City Commissioners subsequent to that indenture, and without the joinder of the other party thereto, to-wit: the trustee for the bondholders.

The Comal Plant, for which the City had paid $7,000,000 in cash, and on which the bondholders held a mortgage lien, was delivered to the Board of Trustees by the City and bondholders as a highly important and essential integral part of the "complete" electric system to be controlled and operated by the Trustees during their tenure of office and without any power of interference for any purpose by the cestuis que trustent, to-wit: the City and the bondholders. (It is true that in the indenture were certain restrictions upon the trustees designed to protect the lien of the bondholders, but wholly unrelated to the Board's

exclusive possession and control of operations of the system, and therefore irrelevant to this inquiry.) The Trustees, realizing the necessity of control of the Comal Plant, which had been delivered to them, and being doubtful of the asserted right of the Authorities to take the plant from them, had the inherent right, and it was their duty, to procure an effectual determination of their ultimate right to retain, or duty to surrender to the Authorities, the possession and control of the Plant, which had been given them in the contract of their creation, to the exclusion of all others, including the parties to that contract, to-wit: The City and the bondholders. The only effective determination of their rights and duties in the premises is through judicial adjudication in a court of equity. They had nowhere to go except to the courts, since neither the City nor the bondholders had the power to direct or control, or to enforce their will upon, the Board of Trustees or the threatening invader. Appellees are trustees of the property not only by virtue of the contract of their creation and for the benefit of the bondholders, but they are trustees for the City of San Antonio and its inhabitants as well. They are under the contractual and public duty of carrying out their trust of holding and operating the public utility free of interference from any source, and since their rights and duties in this critical situation can be judicially ascertained and enforced only by the courts, they are entitled to access to the courts for that purpose, that is to say, for a judicial construction of their rights, powers and duties under their charter in the given situation, and for all writs necessary to preserve the status quo pending that adjudication. The trial court has not passed upon the merits of the case which, of course, involves the question of the validity of the lease-option contract; it has passed only upon the right of appellees to a temporary injunction preserving the status quo pending a decision on the merits of the controversy. There is, therefore, nothing before this Court except the questions of the right of appellees to maintain the suit and of their right to the temporary injunction.

The conclusion in the original opinion that the Board of Trustees could not maintain this particular suit was based chiefly if not wholly upon the cases cited therein: Sifford v. Waterworks Board of Trustees, 70 S.W.2d 476, by this Court, and San Antonio Independent School District v. Waterworks Board of Trustees, 120 S.W.2d 861, by the Beaumont Court. After further analysis of the opinions in those two cases I have reached the firm conclusion that neither of them is in point upon the question under consideration here. In the Sifford case the only material holding was, as stated in the single syllabus, that: "Neither trustees of waterworks board nor board which was merely city department created for purpose of operating water system could be held liable for tort arising from condition of water hydrant."

In the School District case the court in effect held, simply, that as the City of San Antonio had acquired and held title to the City Waterworks System the properties thereof were exempt from taxation under the Constitution and laws of the State, notwithstanding "management and control thereof were vested in a special Waterworks Board of Trustees."

The Board of Trustees constitute an independent agency, a highly fiduciary relation, established by contract with the sanction and under express provisions of a valid statute. Under that authority they have been put in presumably lawful and exclusive possession of the "complete" public utility system and charged with the exclusive power and high duty of administering the system in their discretion without interference from the legal owner and the mortgagee of the system, or any other source, over a fixed period of thirty years, and to deliver it back to the City at the end of that period, freed of the bondholders' lien. In my opinion those Trustees have the right to appeal to any court of competent jurisdiction for protection against any unlawful interference or trespass from any source, and upon a proper showing for injunctive relief pending an adjudication of the question of their rights and duties in the premises. The conclusion follows that the Trustees had the right to maintain this action for temporary injunction pending determination of the merits of their case. Of that right I have no doubt, although I have grave doubt that appellees have made such a showing of danger of eviction, or of threatened injury as to entitle them to injunctive relief.