

# Fourth Court of Appeals
## San Antonio, Texas

## OPINION

No. 04-13-00898-CV

**SAN ANTONIO WATER SYSTEM**,
Appellant

v.

Beatriz **SMITH**,
Appellee

From the County Court at Law No. 5, Bexar County, Texas
Trial Court No. 383935
Honorable Irene Rios, Judge Presiding

Opinion by:    Luz Elena D. Chapa, Justice

Sitting:    Karen Angelini, Justice
Rebeca C. Martinez, Justice
Luz Elena D. Chapa, Justice

Delivered and Filed:  September 24, 2014

AFFIRMED

Beatriz Smith sued the San Antonio Water System (SAWS) for injuries she sustained when she fell into a hole on a sidewalk.  SAWS filed a plea to the jurisdiction, asserting it did not receive notice of the claim against it as required by the Texas Tort Claims Act.  The trial court denied the plea.  We affirm the order because we hold that 1) SAWS is not a "governmental unit" entitled to notice under the Act separate and apart from notice to the City of San Antonio and 2) Smith presented sufficient evidence to raise a fact question as to whether the City of San Antonio had actual notice of Smith's injury claim.

**BACKGROUND**

The evidence submitted to the trial court in support of and in response to the plea to the jurisdiction reflects that on February 16, 2011, Smith fell into an uncovered hole on the sidewalk in front of a church located on the 2900 block of Mission Road in San Antonio. Bexar County Deputy Constable Gabriel Medina, a City of San Antonio Fire Department unit, and an EMS unit responded. The Incident Detail Reports reflect that when the Fire Department arrived, a Bexar County officer was at the scene "with elderly female who fell and may have broken her arm." One of the reports states Smith said she was injured because of an uncovered hole on the sidewalk. The report also states that Deputy Constable Medina called "city public works" to have someone secure the hole and was transferred to SAWS and that the San Antonio Fire Department placed yellow crime-scene tape around the hole to secure the area until a SAWS representative arrived.

SAWS's records reflect Deputy Constable Medina's call came through the City's 311 system and was transferred to the SAWS emergency operations center. That telephone call resulted in a SAWS work order for "meter box maintenance" at 2919 Mission Road. The work order states: "missing meter cover in front of church of South San Antonio Bexar Co. police officer someone fell down in hole." The work order indicates that SAWS replaced an air release valve cover at that location later the same day.

In March 2011, Smith's attorney sent a letter to the Claims Department of CPS Energy— the City of San Antonio's gas and electric utility system. The letter advised that the law firm "represents Beatriz Smith, for her injuries suffered sustained after falling into a hole with exposed pipes on the 2900 Block of Mission Rd, on February 16, 2011, in Bexar County, Texas." The letter further stated that Smith was undergoing medical treatment for her injuries sustained in the accident and when the attorney "obtained all the specials, [he] will forward them to you along with

our letter of demand." Less than a week later, the CPS claims manager responded to the attorney, stating:

> We have completed a thorough investigation of your client Ms. Smith's claim for personal injuries sustained at the above location. CPS Energy doesn't have gas or electric equipment and or infrastructure located on the sidewalk at the above location.
>
> We respectfully deny your clients [sic] claim. . . . .

Smith filed her lawsuit on February 14, 2013. Smith named as defendants: The City of San Antonio; The City of San Antonio d/b/a City Public Service and/or CPS Energy; The City of San Antonio Water System (SAWS) (alleged to be "a subsidiary of the City"); and Bexar Metropolitan Water District, now known as the San Antonio Water System. Smith also named as defendants a church and a business that are located on the 2900 block of Mission Road. Smith alleged she suffered serious bodily injuries as a result of the fall that was proximately caused by a dangerous condition on the sidewalk.

SAWS filed its plea to the jurisdiction in October 2013, asserting it had not received timely statutory notice or actual notice of the claim.[1] After Smith responded, the trial court held a non-evidentiary hearing and denied the plea. This appeal followed.

## STANDARD OF REVIEW

We review the trial court's ruling on a plea to the jurisdiction de novo. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 228 (Tex. 2004). When the plea to the jurisdiction challenges the existence of jurisdictional facts, "we consider relevant evidence submitted by the parties when necessary to resolve the jurisdictional issues raised . . . ." *Id.* at 227. "If the evidence creates a fact question regarding the jurisdictional issue, then the trial court cannot grant the plea

---

[1] The City filed a plea to the jurisdiction in the trial court, contending it did not receive proper pre-suit notice. The trial court denied the plea and the City did not file an interlocutory appeal from the trial court's order.

to the jurisdiction, and the fact issue will be resolved by the fact finder." *Id.* at 227–28. "However, if the relevant evidence is undisputed or fails to raise a fact question on the jurisdictional issue, the trial court rules on the plea to the jurisdiction as a matter of law." *Id.* at 228. "[T]his standard generally mirrors that of a summary judgment under Texas Rule of Civil Procedure 166a(c)." *Id.* In reviewing the trial court's ruling on the plea, we take as true all evidence favorable to the respondent and indulge every reasonable inference and resolve any doubts in the respondent's favor. *Id.*

## "GOVERNMENTAL UNIT" AND NOTICE UNDER THE TORT CLAIMS ACT

Smith alleged that immunity for SAWS's performance of governmental functions is waived by the Texas Tort Claims Act because she seeks damages for personal injuries caused by a premise defect. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.021 (West 2011). To invoke the Act's waiver of immunity, a claimant must give a governmental unit pre-suit notice of the claim. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.101 (West 2011) (providing that a "governmental unit is entitled to receive notice of a claim against it" within six months of the incident giving rise to the claim). "The provision of notice is a jurisdictional requirement in all suits against a governmental unit." *City of Dallas v. Carbajal*, 324 S.W.3d 537, 537–38 (Tex. 2010) (per curiam); TEX. GOV'T CODE ANN. § 311.034 (West 2013).

SAWS contends it is a "governmental unit" entitled to receive notice under section 101.101, separate and apart from any notice given to the City of San Antonio or CPS Energy. SAWS contends its governmental immunity has not been waived because Smith did not send timely formal notice to SAWS and because SAWS agents and employees did not have actual notice of Smith's claim. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.101 (providing that notice requirement is satisfied if governmental unit receives formal notice or has actual notice). SAWS also argues the trial court should not have considered any evidence of notice to the City or its

employees that was not communicated to SAWS. Smith argues that she was not required to give separate notice to SAWS, that she complied with the statutory notice requirement by giving notice to the City of San Antonio, and that the City and SAWS had actual notice of the claim. We first determine whether SAWS is a governmental unit and then turn to the question of whether the required notice was given in this case.

The Texas Tort Claims Act defines "governmental unit" as:

(A) this state and all the several agencies of government that collectively constitute the government of this state, including other agencies bearing different designations, and all departments, bureaus, boards, commissions, offices, agencies, councils, and courts;

(B) a political subdivision of this state, including any city, county, school district, junior college district, levee improvement district, drainage district, irrigation district, water improvement district, water control and improvement district, water control and preservation district, freshwater supply district, navigation district, conservation and reclamation district, soil conservation district, communication district, public health district, and river authority;

(C) an emergency service organization; and

(D) any other institution, agency, or organ of government the status and authority of which are derived from the Constitution of Texas or from laws passed by the legislature under the constitution.

TEX. CIV. PRAC. & REM. CODE ANN. § 101.001(3) (West Supp. 2014). SAWS argues it is a governmental unit within the meaning of section 101.001(3)(D) because it is an "agency" of the City of San Antonio and was created by ordinance pursuant to constitutional authority given to home-rule municipalities. Smith concedes that the City has delegated management of the water system to the SAWS board of trustees, but contends that SAWS remains part of the City, and is not a separate governmental unit. Smith argues that the City and its agencies, like the county and its agencies, are one governmental unit. *See Rosales v. Brazoria Cnty.*, 764 S.W.2d 342, 344 (Tex. App.—Texarkana 1989, no writ) (holding county sheriff's office is not a separate governmental unit from the county itself).

Texas law authorizes home-rule municipalities, such as the City of San Antonio, to own, construct, and manage a water system, to pledge the system's revenues, and to create a separate fund dedicated solely to operating, maintaining, and improving the system. *See* TEX. LOCAL GOV'T CODE ANN. § 552.017 (West Supp. 2014); TEX. GOV'T CODE ANN. § 1502.001, *et seq.* (West 2000 & Supp. 2014). Texas law also authorizes a municipality to place management and control of the system in a board of trustees. *See* TEX. GOV'T CODE ANN. §1502.070 (West Supp. 2014). The issue before us is whether by doing so, the municipality creates an agency that derives its status and authority from the constitution or from the laws passed by the legislature. To answer the question, we examine the history and status of SAWS and its board of trustees and the authority under which SAWS operates.

### STATUS AND AUTHORITY OF SAWS AND ITS BOARD OF TRUSTEES

*The City of San Antonio waterworks system*

The City of San Antonio purchased its waterworks system from a private entity in 1925. *San Antonio Indep. Sch. Dist. v. Water Works Bd. of Trs.*, 120 S.W.2d 861, 863 (Tex. Civ. App.— Beaumont 1938, writ ref'd). Pursuant to city ordinance and the trust agreements securing the revenue bonds issued to finance the purchase, control and management of the system was placed in the hands of a newly created Water Works Board of Trustees. *Id.* at 863–64. The trust agreement and ordinance gave the Board exclusive control over income from operation of the system. *Id.* at 864. The income was to be set aside and kept separate in a depository of the Board's selection and all operating and maintenance costs were to be paid from those revenues. *Id.*

In a suit filed by the San Antonio Independent School District, the District argued the waterworks system assets were taxable because the Water Works Board was not part of the City. *Id.* at 862, 865. The court of appeals held the property was exempt from taxation, the Board was a "special agency" of the city, and that the Board's "'possession' and 'holding' of the property is

a possession and holding by the City itself." *Id.* at 865. Likewise, in *Sifford v. Waterworks Board of Trustees*, this court concluded the Waterworks Board "was merely a department and agency of the city to take charge of and operate for the city its water system, just as the departments of the fire and police . . ." 70 S.W.2d 476, 477 (Tex. Civ. App.—San Antonio 1934, writ ref'd). The court held the Board "could not be held liable for debt or tort, but that the city, if any one, was the party liable under such claims." *Id.*

By 1969, the City of San Antonio had issued refunding bonds and a 1957 city ordinance vested control, management, and operation of the waterworks system in the Water Works Board. *Delta Elec. Constr. Co. v. City of San Antonio*, 437 S.W.2d 602, 603-04 (Tex. Civ. App.—San Antonio 1969, writ ref'd n.r.e.). In a declaratory judgment action involving a contract to construct improvements to the system entered into between the Water Works Board of Trustees and a private company, this court held that the Water Works Board "is an agency and department of the City and therefore the contract in question was a contract with the City." *Id.* at 605.[2]

### SAWS under the 1992 Ordinance

Today, SAWS is "[t]he San Antonio Water System, a water, wastewater and wastewater reuse agency of the city, established and created pursuant to the provisions of Ordinance No. 75686 and Texas Revised Civil Statutes Annotated Article 1115." San Antonio, Tex., Code of Ordinances Part II, ch. 34, art. II, § 34-2.01 (2014). The San Antonio City Council passed Ordinance No. 75686 ("the Ordinance") in 1992 to consolidate the City's waterworks system (previously operating as an agency of the City under the management and control of the Waterworks Board of Trustees) and the City's sanitary sewer and water reuse systems (previously

---

[2] The provisions of the ordinance the court found particularly relevant to its decision are very similar to provisions in the ordinance under which SAWS currently operates. *Compare Delta Elec.*, 437 S.W.2d at 605, *with* San Antonio, Tex., Ordinance 75686, §§ 28, 29, 32-D, M & N (Apr. 30, 1992).

operating as departments of the City). San Antonio, Tex., Ordinance 75686, Recitals (Apr. 30, 1992).

The Ordinance placed management and control of the consolidated system in the hands of a board of trustees established and created pursuant to the provisions of the Ordinance and former article 1115 of the Texas Revised Civil Statutes. *Id.* Former article 1115 provided that the city council of a city owning an encumbered waterworks system could place the management and control of the system in the hands of a board of trustees, required that one of the board members be the mayor, and limited the compensation of board members, but did not specify the powers and duties of such board. Act effective June 9, 1911, 32nd Leg., R.S., ch. 112, § 4, 1911 Tex. Gen. Laws 230, 231, *repealed and codified by* Act of May 10, 1999, 76th Leg., R.S., ch. 227, §§ 1, 28(a), 1999 Tex. Gen. Laws 721, 900, 1056; *renumbered and amended by* Act of May 20, 1999, 76th Leg. R.S., ch. 1064, § 22, 1999 Tex. Gen. Laws 3899, 3910 (current version at TEX. GOV'T CODE § 1502.070 (West Supp. 2014)).[3]

The Ordinance authorized the City to issue bonds to pay for the consolidated water system and pledged system revenues as collateral. Ordinance 75686, §§ 3, 12. The City covenanted that the gross revenues generated by the system would be deposited by the Board into a separate Water System Revenue Fund. *Id.* § 14. The Ordinance stated the fund was to be kept completely separate from all other funds of the City, and specified the priorities for budgeting and spending revenues. *Id.* The City also covenanted to establish and maintain rates and fees at a level that would produce gross revenues sufficient to pay the City's debt obligations and the system's maintenance and

---

[3] Current law maintains the requirement that one of the trustees be the mayor of the municipality and places an upper limit on trustee compensation. TEX. GOV'T CODE ANN. §1502.070(a)(2), (b) (West Supp. 2014). The powers and duties of the board and the manner of exercising those powers and duties are to be specified in proceedings of the municipality and, to the extent not covered by such proceedings, the board of trustees is governed by the laws and rules governing the municipality's governing body. *Id.* §1502.070(c).

operating expenses and to pay a percentage of gross revenues into the City's General Fund[4] and into the Water System Renewal and Replacement Fund. *Id.* §§ 13, 17.

The section of the Ordinance about management of the system provided for the City Council to appoint the board members, fill vacancies on the board, and appoint the chairman of the board. *Id.* § 32-A, D, & G. The Ordinance authorized the board to hire employees and professional consultants as it deems necessary, but stipulated that the City Attorney is the board's chief legal adviser. *Id.* § 32-H. Although the Ordinance gave the SAWS board considerable authority and discretion in operating and managing the system, it did not transfer ownership of the assets of the system, nor did it abdicate the City's ultimate responsibility for operation of the system and fulfillment of the City's debt obligations. For example, although the Ordinance authorized the board to determine the rates, fees, and charges for services rendered by the System, any proposed change in the rates, fees, or charges (either increase or decrease) must be submitted to, approved by, and adopted by the City Council. *Id.* § 32-F. The City Council expressly reserved the right to abolish or reconstitute the SAWS board by ordinance. *Id.* § 32-V.

In support of its plea to the jurisdiction, SAWS filed the affidavit of its claims supervisor, providing information about how the claims department operates:

> The SAWS Claim Department is operated completely independent from the City of San Antonio (COSA) and City Public Service (CPS). When a claim for property damage or for bodily injury is made to SAWS, SAWS investigates those issues associated with SAWS facilities, lines, meters and other SAWS utility property.

---

[4] Section 17 of the Ordinance provided for a monthly transfer into the City's General Fund a percentage of the System's gross revenues, "to be utilized by the City in the manner permitted by the provisions of Texas Revised Civil Statutes Annotated Article 1113a, as amended." That section authorized the City to make a reasonable profit from its publicly owned utility system. *See San Antonio Indep. Sch. Dist. v. City of San Antonio*, 550 S.W.2d 262, 264 (Tex. 1976) (discussing City's publicly owned gas and electric system). Article 1113a was repealed in 1999 and its substance is now found in section 1502.059 of the Government Code, which provides, "a municipality and its officers and utility trustees may transfer to the municipality's general fund and may use for general or special purposes revenue of any municipally owned utility system in the amount and to the extent authorized in the indenture, deed of trust, or ordinance providing for and securing payment of public securities issued under this chapter or similar law." TEX. GOV'T CODE ANN. § 1502.059 (West 2000).

> SAWS does not investigate any claims associated on behalf of COSA or CPS, and vice versa. . . .
>
> . . .
>
> Once a determination is made that a claim relates to a SAWS' utility line or property, the claim is investigated and liability is evaluated by the Claims Department. We determine whether there is a basis to either pay or deny the claim. If we determine the claim should be paid, it is paid from a special reserve fund that is funded with SAWS ratepayer revenues; CPS and COSA do not contribute to or control this fund. The reserve fund is established by SAWS annually and is based on prior claims history and other factors from SAWS' operations. The proposed amount for the general obligation liability fund for claims is part of SAWS' annual budget adopted by the SAWS governing body.

The affidavit also makes general statements about SAWS's operations:

> SAWS funding is derived from its ratepayers. SAWS is managed and operated by a separate Board of Directors, a CEO, and staff of 1,718 employees; it maintains its own registered agent and operates its own Claims Department.

The affidavit concludes that "SAWS' operations and management is separate from COSA," but does not provide any information about the authority pursuant to which SAWS and its board operate.

***Status and Authority of SAWS - Analysis***

The record establishes that SAWS is a municipally-owned utility. Although SAWS is not an entity independent from the City of San Antonio, management and control of the utility has been delegated by the City to the SAWS board of trustees. In exercising such management and control, the SAWS board acts as an agent of the City. *See Zacharie v. City of San Antonio*, 952 S.W.2d 56, 59 (Tex. App.—San Antonio 1997, no writ) (rejecting plaintiff's argument that SAWS is entity independent from City and holding SAWS is an agent of City and claim against City of San Antonio, acting by and through its San Antonio Water System Board of Trustees, was barred by governmental immunity); TEX. ATT'Y GEN. OP. No. DM-444 (1997) (concluding that board of a municipal utility system created pursuant to former article 1115 is agent of municipality and not

a separate legal entity). The SAWS board of trustees has considerable autonomy, but remains subject to city council oversight, and the powers and duties of the board are limited to those delegated by city ordinance.

We find no evidence and SAWS has presented no argument to support a conclusion that SAWS and its board are different in any significant way from the former Water Works Board of Trustees, which this court held was essentially a department of the city. *See Delta Elec.*, 437 S.W.2d at 605 (stating Board "is an agency and department of the City and therefore the contract in question was a contract with the City"); *Sifford*, 70 S.W.2d at 477 (stating "water board was merely a department and agency of the city to take charge of and operate for the city is water system, just as the departments of the fire and police" and city, if anyone, is liable for debts and torts of water board); *see also* TEX. ATT'Y GEN. OP. No. DM-444 (1997) (concluding that although city created and delegated broad power to New Braunfels Utilities (NBU) board of directors pursuant to article 1115, including powers to enter into contracts, set employment policies, and hire and pay personnel and professionals, NBU may acquire property only as agent of City, contract with NBU is contract with city, and employees of NBU are employees of City).

SAWS argues that its status and authority are ultimately derived from the Texas Constitution because the constitution grants home-rule municipalities the full powers of state government unless restricted by the constitution or legislature and because the City passed Ordinance Number 75686 in exercise of those powers. We do not believe that is what the legislature intended by its definition of "governmental unit" in section 101.001(3)(D) of the Tort Claims Act. The Texas Constitution and statutes authorize home-rule *municipalities* to own their water systems. The statutes authorize home-rule *municipalities* to encumber the system assets and create dedicated funds for operating the system, and authorize *municipalities* to place management of the system in the hands of a board of trustees. However, neither the Texas Constitution nor any

statute purports to confer any status or authority on such boards or systems. Instead, the legislature has expressly provided that the proceedings of the *municipality* are to specify the powers and duties of the board of trustees and the manner of exercising those powers and duties. *See* TEX. GOV'T CODE ANN. § 1502.070.[5]

The actual status and authority of SAWS and its board derives exclusively from the city ordinance and the encumbrance documents. *See Guadalupe-Blanco River Auth. v. Tuttle*, 171 S.W.2d 520, 521 (Tex. Civ. App.—San Antonio) (per curiam) (holding members of San Antonio Electric and Gas System board of trustees, created pursuant to article 1115, are municipal agents whose powers and duties derive solely from the contract of encumbrance and the ordinance that created board and that their powers and duties are fixed and limited to those the municipality has expressly or by necessary implication conferred on them), *writ ref'd w.o.m.*, 174 S.W.2d 589 (Tex. 1943). We therefore conclude that SAWS is not an agency of the City, the status and authority of which are derived from the Texas Constitution or from laws passed by the legislature under the constitution. Therefore, SAWS is not a "governmental unit" within the meaning of section 101.001(3) of the Texas Tort Claims Act.

## NOTICE OF CLAIM

Section 101.101 of the Tort Claims Act provides that "[a] governmental unit is entitled to receive notice of a claim against it" within six months of the incident giving rise to the claim. TEX. CIV. PRAC. & REM. CODE ANN. § 101.101(a). The notice must reasonably describe the incident,

---

[5] In contrast, the legislature has at times authorized municipalities to create a governmental body by ordinance and appoint its board of directors, while statutorily designating the status of the entity and its authority. *See e.g.* TEX. HEALTH & SAFETY CODE ANN. title 4, subtitle C, ch. 262 (West 2010)("Municipal Hospital Authorities") (authorizing governing body of municipality to create hospital authority by ordinance and to appoint its directors, designating hospital authority a "body politic and corporate," authorizing hospital authority to issue revenue bonds, exercise the power of eminent domain, and own property, and specifying general powers of authority); *see also City of Edinburg v. Trevino*, 941 S.W.2d 76, 83-85 (Tex. 1997) (holding municipal hospital authority created by city ordinance pursuant to Chapter 262 is a "unit of local government," separate from municipality and subject to lower liability cap than municipality under Texas Tort Claims Act).

the time and place of the incident, and the damage or injury claimed.  *Id.*  Formal notice of the claim is not required if the governmental unit has actual notice that the claimant has received some injury.  *Id.* § 101.101(c).  Because we hold that SAWS is not a "governmental unit" separate from the City, either formal or actual notice to the City satisfies the notice requirement of the Tort Claims Act.

A governmental unit has actual notice if it has knowledge of the injury, the identity of the parties involved, and actual, subjective awareness of its alleged fault in the matter.  *See Carbajal*, 324 S.W.3d at 538–39.  Mere notice that an incident has occurred does not establish actual notice for purposes of the Act, nor may a governmental unit acquire actual notice merely by conducting an investigation.  *Tex. Dep't of Criminal Justice v. Simons*, 140 S.W.3d 338, 347 (Tex. 2004); *Guadalupe Blanco River Auth. v. Schneider*, 392 S.W.3d 321, 323–24 (Tex. App.—San Antonio 2012, no pet.).  Actual notice may be imputed to a governmental unit when an agent or representative of the unit who has a duty to gather facts and report receives notice of an incident.  *Guadalupe Blanco River Auth.*, 392 S.W.3d at 325; *City of Wichita Falls v. Jenkins*, 307 S.W.3d 854 (Tex. App.—Fort Worth 2010, pet. denied).

SAWS contends it did not have actual notice of Smith's claim because the SAWS claims adjuster did not receive a copy of Smith's letter before suit was filed and because SAWS's records do not contain the identity of the person who fell on February 16, 2011, or any indication the person was injured or intended to pursue a claim.  However, to determine if *the City* had actual notice, the City is charged with the knowledge of its agents and representatives who have a duty to gather facts and report information.  *Guadalupe Blanco River Auth.*, 392 S.W.3d at 325; *Univ. of Tex. Health Sci. Ctr. at San Antonio v. Stevens*, 330 S.W.3d 335, 339 (Tex. App.—San Antonio 2010, no pet.).  Actual notice is not limited to a particular official or employee of a government entity, such as the director of risk management or, as in this case, a SAWS claims adjuster.  *See*

*Stevens*, 330 S.W.3d at 339–40. "[A] governmental entity cannot put on metaphorical blinders and designate only one person in its entire organization through whom actual notice may be imputed when the facts support that there are other representatives who have a duty to gather facts and investigate on behalf of the governmental entity." *Id.*

CPS Energy is part of the City of San Antonio, and the CPS claims manager who investigated Smith's claim and responded to the letter is an employee of the City. *See Lowther v. Fernandez*, 668 S.W.2d 886, 888 (Tex. App.—San Antonio 1984, no writ) (holding person employed by CPS is an employee of the City). SAWS does not contend that the CPS claims manager does not have a duty to investigate, gather facts, or report facts. The notice she received from the letter and the facts she learned while investigating the claim are therefore imputed to the City. Likewise, both the city firefighter who responded to the emergency call and the SAWS emergency operations center operator who took the call about the missing cover received notice of some facts about the incident. Both are agents of the City in positions that require obtaining and reporting pertinent information. Their knowledge therefore may be imputed to the City.

SAWS contends Smith's attorney's letter to the CPS claims department is too vague to provide any of the required elements of notice under the Act. We disagree. The letter refers to the "injuries suffered" by Smith and states she is "undergoing medical treatment for injuries sustained in this accident." This is sufficient notice to the City of the injury claimed. *See Jenkins*, 307 S.W.3d at 860-61 (holding letter from attorney stating his clients sustained "personal injuries and other damages" in accident and are "in the process of receiving medical treatment" was sufficient notice under Act). Smith also presented evidence that the city firefighter who responded to assist Smith was aware she was injured and might have broken her arm. Smith's letter to CPS provided the date and the location ("2900 Block of Mission Rd") of the incident and describes it as Smith "falling into a hole with exposed pipes."

The details of the incident and location described in the letter were specific enough to allow the CPS claims manager to conduct and conclude a "thorough investigation" within a week and to determine that there was no CPS "gas or electric equipment and/or infrastructure located on the sidewalk" at that location. Moreover, the Incident Detail Reports of the San Antonio Fire Department and the Bexar County Sheriff's Office described the location as "2900 Mission Road." When Deputy Constable Medina gave this location to the City's 311 system, the operator was able to identify SAWS as the responsible party and transferred him to the SAWS emergency operations center. The SAWS emergency operations center operator was able to identify the specific location so that the missing cover could be replaced the same day.

Finally, the letter provided notice to the City of its alleged fault. When an attorney sends a letter to the claims department of the city-owned utility, stating he represents a claimant for the injuries she suffered when she fell into a hole with exposed pipes, and stating that a demand will be sent when the details of all her injuries are known, it may be fairly implied that the attorney and client are claiming that the City is at fault in the matter. The CPS claims manager appears to have understood the letter that way because in her response to the attorney, she denied the "claim."

The purpose of the notice requirement is to ensure prompt reporting of claims to enable governmental units to gather the information necessary to guard against unfounded claims, facilitate settlement, and prepare for trial. *Cathey v. Booth*, 900 S.W.2d 339, 341 (Tex. 1995) (per curiam). In this case, that purpose was served. The problem appears to be the City's self-imposed compartmentalization of claims processing and the lack of communication among City agencies and departments. The City and its departments, however separately managed and controlled they may be in their day to day operations, and however separate their funds for paying potential claims may be, do not insulate the City from notice of potential claims by failing to communicate with each other. *See Stevens*, 330 S.W.3d at 339-40. The ordinance creating SAWS designates the City

- 15 -

Attorney as SAWS's chief legal counsel. The City Attorney, SAWS, and CPS are all part of the same entity—the City. Smith sent timely notice of her claim to CPS. When the subsequent CPS investigation determined that the uncovered utility hole into which Smith fell did not belong to it, and SAWS independently had knowledge that a person had fallen because of a missing cover at one of its facilities, there is at least a fact question as to whether the City had actual notice of Smith's claim.

## CONCLUSION

We affirm the trial court's order denying the plea to the jurisdiction because SAWS is not a "governmental unit" entitled to notice separate and apart from notice to the City of San Antonio and the evidence raises a fact issue as to whether the City of San Antonio had actual notice of Smith's injury claim.

Luz Elena D. Chapa, Justice