**CITY OF SAN ANTONIO et al. v. GUADA-
LUPE–BLANCO RIVER AU-
THORITY et al.**

**No. 11684.**

Court of Civil Appeals of Texas. Galveston.

Nov. 29, 1945.

Rehearing Denied Dec. 21, 1945.

T. D. Cobbs, Jr., City Atty., and Martin J. Arnold, both of San Antonio, Weaver Moore, of Houston, and Dan Moody, of Austin, for appellant City of San Antonio.

Leo Brewer, W. F. Nowlin, and W. L. Matthews, all of San Antonio, for appellant Board of Trustees of San Antonio Electric & Gas System.

Dayton Ogden, of Chicago, Ill., and C. W. Trueheart, of San Antonio (Chapman & Cutler, of Chicago, Ill., and Trueheart, McMillan & Russell, of San Antonio, of counsel), for appellants Harris Trust & Savings Bank and Harold Eckhart.

Ben H. Powell, J. A. Rauhut, and W. S. Gideon, all of Austin, for appellee Lower Colorado River Authority.

Vinson, Elkins, Weems & Francis, of Houston, D. W. Glasscock, of Austin, E. M. Cape, of San Marcos, and A. J. Wirtz, of Austin (Hart & Brown, of Austin, Fred L. Blundell, of Lockhart, and Tom G. Oliver, of San Marcos, of counsel), for appellee Guadalupe-Blanco River Authority.

MONTEITH, Chief Justice, and CODY, Justice.

Two suits were brought by the appellants herein in the district courts of Bexar County, W. B. Tuttle et al. v. City of San Antonio et al., No. F6748, in the 45th District Court, and City of San Antonio v. Lower Colorado River Authority et al., No. F11527, in the 73rd District Court. The two suits were transferred, under order of the Supreme Court and by agreement of the parties, to the 61st District Court of Harris County and consolidated. The consolidated case was repleaded and tried under docket No. 300,602, styled *City of San*

Antonio et al. v. Guadalupe-Blanco River Authority et al.

In the consolidated suit the City of San Antonio, as plaintiff, complaining of Guadalupe-Blanco River Authority, Lower Colorado River Authority, Harris Trust and Savings Bank of Chicago, and Harold Eckhart, Board of Trustees of San Antonio Electric and Gas System, and Walter F. Napier et al., constituting the Board of Trustees of San Antonio Electric and Gas System, as defendants, sought judgment (1) adjudging the invalidity of a certain purported contract of sale and lease between the City of San Antonio and Guadalupe-Blanco River Authority and the ordinance under which it was signed; (2) adjudging the invalidity of the assignment of the purported contract of sale and lease and the ordinance under which the City joined in the execution of the instrument of assignment; (3) establishing and quieting in the City of San Antonio, against the claims of the Guadalupe-Blanco River Authority and Lower Colorado River Authority, the title to and right of possession of properties described in the purported contract of sale and lease, and (4) enjoining interference with the City of San Antonio and the Board of Trustees of San Antonio Electric & Gas System in the possession, management and control of said property.

Guadalupe-Blanco River Authority and Lower Colorado River Authority, as assignee of Guadalupe-Blanco River Authority, claiming rights under said contract of sale and lease, sought judgment upholding its validity.

Harris Trust & Savings Bank of Chicago and Harold Eckhart, Trustees under a revenue bond indenture, and Walter P. Napier, Franz Groos, W. B. Tuttle, D. F. Youngblood and Gus Mauermann, as the Board of Trustees of San Antonio Electric & Gas System, sought judgment declaring their respective rights and duties in the event the challenged contract of sale and lease was upheld.

The trial court directed a verdict in favor of the Guadalupe-Blanco River Authority and Lower Colorado River Authority and entered judgment against the City of San Antonio and all other defendants, upholding the challenged contract of sale and lease. The court denied Harris Trust & Savings Bank of Illinois and Harold Eckhart, Trustees, the relief sought, and denied the pleas for declara-

tory judgment of the Board of Trustees of San Antonio Electric & Gas System. All parties against whom judgment was so rendered have appealed.

In this opinion the City of San Antonio will be referred to as the City, Guadalupe-Blanco River Authority will be referred to as Blanco Authority, Lower Colorado River Authority will be referred to as Colorado Authority, Harris Trust & Savings Bank of Chicago and Harold Eckhart, as trustees, will be referred to as trustees for the bondholders, and Walter P. Napier, Franz Groos, W. B. Tuttle, D. F. Youngblood, and Gus B. Mauermann, constituting the Board of Trustees of the San Antonio Electric & Gas System, will be referred to as Board of Trustees. The lease contract which purports to grant the lessee an option to buy the leased property will be referred to as the contract of sale and lease.

This case arose out of a controversy between the City of San Antonio and the Blanco Authority and the Colorado Authority with reference to the validity of a 30-year lease and power contract, including an option to purchase the leased properties on termination of the lease, executed by the City of San Antonio and covering an electric generating plant known as the Comal plant, located in New Braunfels, Tex., and appurtenant properties. The contract of lease in question was executed on October 24, 1942, simultaneously with the acquisition by the City of the electric utility system serving the City. The electric utility system, including the properties made the subject of the lease contract, had been purchased by the City in pursuance of the powers conferred on it by Articles 1111–1118, Revised Civil Statutes, Vernon's Ann.Civ.St. arts. 1111–1118. An indenture was executed by the City, delivered and effective with the acquisition by the City of the Electric utility system conveying to the trustees for the bondholders all property acquired by the City from the Public Service Company, pledging the properties of the system and its revenues to secure the payment of the revenue bonds executed by the City, as the purchase price for the utility properties. The indenture required the City to operate and maintain the utility plant as a self-liquidating project and to apply the revenues derived therefrom to the payment of the purchase money revenue bonds which were issued in acquiring the system.

Prior to the date of the purchase of said properties by the City, the City and surrounding territory were served with gas and electricity by San Antonio Public Service Company, a private utility corporation. The Comal plant was the larger of two generating stations belonging to the utility company. It was utilized by the Company for serving the City of San Antonio with electricity. The Comal plant was located at New Braunfels, thirty miles from San Antonio on account of the abundant water supply, which greatly increased the efficiency of the system. This plant was shown to be a necessary and indispensable part of the City's electric system.

Prior to November, 1941, the Securities & Exchange Commission under Public Utilities Holding Company Act, had instructed the American Light & Traction Company, the owner of the common stock of the San Antonio Public Service Company, to dispose of its holdings in the San Antonio Company.

The Blanco Authority, which was created by the State Legislature in 1935 as a conservation and reclamation district under Section 59 of Article XVI of the Constitution, Vernon's Ann. St., acting through A. J. Wirtz and W. D. Glasscock, its authorized agents, had entered into negotiations with American Light & Traction Company to acquire the properties of the San Antonio Public Service Company in the latter part of 1941. In the process of these negotiations they met with and disclosed to the mayor of the City of San Antonio and certain of the city commissioners that the Blanco Authority purposed to purchase the assets of the San Antonio Public Service Company. They proposed to the City that, in the event the Blanco Authority was successful in purchasing the assets of the Utility Company, it sell the City the electric distribution system and that the City buy its electricity from the Blanco Authority. This proposal was refused by the City. Later, on May 27, 1942, the city commissioners adopted a resolution authorizing the mayor to enter into negotiations for the purchase by the City of the gas and electric properties of San Antonio Public Service Company.

On June 8, 1942, the mayor and commissioners of the City of San Antonio adopted an ordinance authorizing the purchase or condemnation of the properties of the San

Antonio Public Service Company, and on June 9, 1942, the City filed its petition in condemnation in the county court of Bexar County, seeking to condemn all of the electric, gas and bus transportation properties of the Public Service Company. On June 15, 1942, the City entered into a contract with a group of investment bankers by the terms of which the bankers agreed to employ engineers to make a report of the value of the properties and an estimate of earnings of the Utility Company, and to employ attorneys to prepare the necessary papers for the issuance of revenue bonds. The contract for the sale of said revenue bonds provided for delivery by October 26, 1942. On July 8, 1942, the City of San Antonio entered into a contract with American Light & Traction Company providing for the purchase of the common stock of San Antonio Public Service Company. The contract was to expire on December 1, 1942. On July 9, 1942, the president of American Light & Traction Company advised A. J. Wirtz, the Agent of Blanco Authority, that he had entered into a contract for the sale of said properties to the City of San Antonio. On July 10, 1942, Blanco Authority, through its agents, filed two condemnation suits, one in Comal County seeking to condemn the Comal Plant, and another in Hays County seeking to condemn all of the properties of the company in San Antonio and elsewhere. On July 10, 1942, the City filed a condemnation proceeding in Comal County seeking to condemn the Comal plant and other properties in that county. On July 13, 1942, Blanco Authority filed a suit in the district court of Comal County in which they sought an injunction enjoining the City from prosecuting or colluding with the San Antonio Public Service Company in the entry of judgments of condemnation in above suits. These suits were later dismissed. On October 7, 1942, San Antonio Public Service Company filed a suit to remove cloud from title cast by the Blanco Authority condemnation proceeding.

On July 10, 1942, the Board of Commissioners of the City of San Antonio had issued notice in pursuance of the Bond and Warrant Law of intention of adopting ordinance on July 25, 1942, providing for the purchase, in accordance with Article 1111 et seq., Vernon's Ann. Civil Statutes, of all of the electric and gas properties of the San Antonio Public Service Company and, in pursuance of said notice, on July 25, 1942, the Board of Commissioners adopted an ordinance authorizing the purchase of said gas and electric properties and providing for the issuance of $35,000,-000 of revenue bonds in pursuance of said Articles 1111 et seq. The ordinance provided that the City should acquire the entire electric and power system and the gas distribution system serving the City. It provided for the issuance of revenue bonds under authority of Article 1111 to be used in acquiring said properties and pledged the properties and the revenues therefrom to secure the payment of said bonds to a group of investment bankers who had previously contracted to purchase said revenue bonds.

Later the governing body of the City of San Antonio entered into negotiations with the agents of Blanco Authority for the purpose of securing the dismissal of Blanco Authority's litigation with the City. As a result of these negotiations it was agreed that the Blanco Authority would dismiss these proceedings and that the City would lease the Comal plant and its appurtenances to the Blanco Authority with option to purchase.

On October 24, 1942, the gas and electric properties of the San Antonio Public Service Company, including the properties made the subject of the contract of sale and lease, were deeded by general warranty deed by the Trustees in Dissolution of San Antonio Public Service Company to the City; electric and gas revenue bonds in the amount of $33,950,000 out of the authorized issue of $35,000,000 were delivered to the purchasers of the bonds in accordance with the sales agreement previously made with the investment bankers who were the best bidders for the bonds. An indenture agreement had been executed and acknowledged by the mayor of San Antonio on October 9, 1942, and by the trustees of the bondholders on October 13, 1942. It provided that all properties acquired by the City and used or useful to the operation of the City's electric light and power plant should be held in trust for Harris Trust & Savings Bank and Harold Eckhart, as trustees for the bond holders, to secure payment of the bonds and performance of the obligations of the indenture, and that all revenues of every nature received through the operation of the system should

be deposited in a named fund to be applied to certain express purposes, including the payment of expenses of operation and maintenance of the system, the payment of interest on the bonds, and the establishment of a reserve fund for renewals, extensions and replacements. ·

The contract for the lease and sale of the Comal plant and the assignment thereof to the Colorado Authority were executed on October 24, 1942. It included an option to purchase the Comal plant and its appurtenances at the expiration of the lease, and specifically provided that it was inferior and subordinate to all of the terms of the indenture securing the revenue bonds. Upon delivery of the contract of sale and lease, the Blanco Authority dismissed its two condemnation proceedings and its injunction suit.

If, as we believe, the lease-option contract from the City to Blanco Authority was not merely voidable, but void, many of the propositions urged by the parties to this appeal pass out of the case.

Appellants contend that the contract of lease and option to sell the properties acquired by the City from the San Antonio Public Service Company, including the Comal plant, were void under the provisions of Arts. 1111–1118, Vernon's Ann. Civil Statutes, which provided a means whereby a city may acquire and operate an electric utility system as a self-liquidating project to be paid for out of the revenues of the system, in that (1) it violated Art. 1112, which prohibits the sale or encumbrance of a light or natural gas system acquired in accordance with the provisions of said Art. 1111 for more than $5000, except for purchase money or existing indebtedness lawfully created, until such sale or encumbrance is authorized by a majority vote of the qualified voters of such city or town; (2) in that the lease contract constitutes an attempt to divert a part of the revenues of the City's electric system, in violation of Art. 1113, which provides that no part of the income of any such system shall ever be used to pay any other debt, expense or obligation of such city until the indebtedness so secured has been finally paid; (3) in that such lease contract attempts to set over to Blanco Authority and its assignee, Colorado Authority, for a period of 30 years, essential parts of the system together with all revenues derived from the operation of such parts of the system; (4) in that such contract violates said Art. 1115, which provides that the management and control of any such system during the time that it is encumbered for one of the purposes named in said Art. 1111, shall be in the hands of city council or in the hands of a board of trustees, and that the lease contract attempts to surrender to Blanco Authority and its assignee, Colorado Authority, for a term of 30 years, possession, use and control of essential parts of the system.

Based on these contentions, the controlling issues presented in the appeal are: (1) Whether the proceedings for the acquisition by the City of San Antonio of the properties of the San Antonio Public Service Company were in the exercise of the powers granted by said Arts. 1111–1118; and (2) whether the contract to lease, including the option to purchase the Comal plant, by the Blanco Authority violated the provisions of said Arts. 1111–1118.

The applicable portions of said Articles, with supplied emphasis on pertinent wording, read:

Art. 1111: "All cities and towns including Home Rule Cities operating under this title shall have power to build and purchase, to mortgage and encumber their light systems, water systems, sewer systems, or sanitary disposal equipment and appliances, or natural gas systems, parks, and/or swimming pools, either, or all, and the franchise and income thereof and everything pertaining thereto acquired or to be acquired and to evidence the obligation therefor by the issuance of bonds, notes, or warrants, and to secure the payment of funds to purchase same; or to purchase additional water powers, riparian rights, or to build, improve, enlarge, extend or repair such systems, or any one of them, including the purchase of equipment and appliances for the sanitary disposal of excreta and offal, and as additional security therefor, by the terms of such encumbrance, may grant to the purchaser under sale or foreclosure thereunder, a franchise to operate the systems and properties so purchased for a term of not over twenty (20) years after purchase, subject to all laws regulating same then in force. No such obligation of any such systems shall ever be a debt of such city or town, but solely a charge upon the properties of the system so encumbered, and shall never be reckoned in determining the power of any such city or town to issue any bonds for any purpose authorized by law."

Art. 1112. "No such light, water, sewer, or natural gas systems, parks and/or swimming pools, *shall ever be sold until such sale is authorized by a majority vote of the qualified voters of such city or town; nor shall same be encumbered for more than Five Thousand ($5,000.00) Dollars, except for purchase money, or to refund any existing indebtedness lawfully created, until authorized in like manner.* Such vote in either case shall be ascertained at an election, which election shall be held and notice thereof given as is provided in the case of the issuance of municipal bonds by such cities and towns. [As amended] Acts 1927, 40th Leg., p. 276. ch. 194; Acts 1932, 42nd Leg., 3rd C.S., p. 96, ch. 32; Acts 1933, 43rd Leg., p. 320, ch. 122."

Art. 1113. "Whenever the income of any light, water, sewer, or natural gas systems, parks and/or swimming pools, shall be encumbered under this law, the expense of operation and maintenance, including all salaries, labor, materials, interest, repairs and extensions necessary to render efficient service and every proper item of expense shall always be a first lien and charge against such incomes. Provided, that only such repairs and extensions, as in the judgment of the governing body of such city or town, are necessary to keep the plant or utility in operation and render adequate service to such city or town and the inhabitants thereof, or such as might be necessary to meet such physical accident or condition which would otherwise impair the original securities, shall be a lien prior to any existing lien. * * *. There shall be charged and collected for such services a sufficient rate to pay all operating, maintenance, depreciation, replacement, betterment and interest charged, and for interest and sinking fund sufficient to pay any bonds issued to purchase, construct or improve any such systems or any outstanding indebtedness against same. No part of the income of any such system shall ever be used to pay any other debt, expense, or obligation of such city or town, * * * until the indebtedness so secured shall have been finally paid. * * *"

Art. 1114. "Every contract, bond, note or other evidence of indebtedness issued or included under this law contain this clause: 'The holder hereof shall never have the right to demand payment of this obligation out of any funds raised or to be raised by taxation.' Where bonds are issued hereunder they may be presented to the Attorney General for his approval as is provided for the approval of municipal bonds issued by such cities or towns. In such case, the bonds shall be registered by the State Comptroller as in the case of other municipal bonds. [As amended] Acts 1933, 43rd Leg., p. 320, ch. 122."

Art. 1114a. "Projects financed in accordance with this law are hereby declared to be self liquidating in character and supported by charge other than by taxation. Acts 1933, 43rd Leg., p. 320, ch. 122."

Art. 1114c. "The actions of all cities and towns and of all officials in passing ordinances, adopting resolutions, executing securities and delivering securities to accomplish the objects permitted under this Act are hereby expressly authorized and validated in like manner as if this law had been effective at the time of such actions, subject to the provisions of Section 5."

Art. 1115 *"The management and control of any such system or systems during the time they are encumbered, may by the terms of such encumbrance, be placed in the hands of the city council of such town, or may be placed in the hands of a board of trustees to be named in such encumbrance, consisting of not more than five members, one of whom shall be the mayor of such city or town.* The compensation for such trustees shall be fixed by such contract, but shall never exceed five per cent of the gross receipts of such system in any one year. The terms of office of such board of trustees, their powers and duties, the manner of exercising same, the election of their successors, and all matters pertaining to their organization and duties may be specified in such contract of encumbrance. In all matters where such contract is silent, the laws and rules governing the council of such city or town shall govern said board of trustees so far as applicable."

Art. 1116. "The city council or board of trustees having such management and control shall have the power to make rules and regulations governing the furnishing of service to patrons and for the payment of the same, and providing for the discontinuance of such service failing to pay therefor when due until payment is made. The city council shall have power to provide penalties for the violation of such rules and regulations and for the use of such service without the consent or knowledge of the authorities in charge thereof, and to provide penalties for all interference, trespassing or injury to any such systems, ap-

pliances or premises on which same may be located."

Art. 1118. "No collection fees shall accrue, and no foreclosure proceedings shall be begun in any court or through any trustee, and no option to mature any part of such obligation because of default in payment of any installment of principal or interest shall be exercised until ninety days written notice shall be given to each member of the city council of such city or town and to each member of such board of trustees, if any, that payment has been demanded and default made, which notice shall date from the sending of a prepaid registered letter to each person to be notified, addressed to them at the post office in such city or town. If the installments of principal and interest then due shall be paid before the expiration of said ninety days, together with the interest prescribed in such contract, not exceeding ten per cent per annum, from the date of default until the date of payment, it shall have like effect as if paid on the date the same was originally due."

It is undisputed that the City of San Antonio was operating under a Home Rule charter. As above stated, the properties of the San Antonio Public Service Company were purchased by the issuance of bonds by the City and that an indenture was issued to secure the holders of said bonds in their payment. It is undisputed that the lease contract in question, including the option to purchase in favor of Blanco Authority, was not authorized by a majority vote of the qualified voters of the City of San Antonio.

■ It is, we think, the settled law of this state that the lease and option contract in question to the Blanco Authority constitutes an encumbrance on the City's electric system. In the case of City of Dayton v. Allred, 123 Tex. 60, 68 S.W.2d 172, it was held, under a parallel state of facts, that a mortgage on the income of the Waterworks plant of the City of Dayton constituted a burden or charge upon the City's utility system, and that it was an encumbrance on the plant, and the proposition not having been submitted to a vote of the qualified voters of the city, the bonds not having been issued for purchase money thereof, was in violation of said Art. 1112 and was void. The rule announced in the City of Dayton v. Allred, supra, is followed in the case of Radford v. City of Cross Plains, 126 Tex. 153, 86 S.W.2d 204.

It is undisputed in the record that the fee simple title to the various properties which are described in the general warranty deed from the San Antonio Public Service Company to the City of San Antonio, including the Comal plant, was vested in the San Antonio Public Service Company prior to the transfer of these properties to the City. There was nothing in the deed from the Utility Company to the City to limit the estate thereby conveyed. The city on the face of the deed acquired the fee simple estate in the Comal plant. Art. 1291.

■■ In the event the City acquired the property conveyed to it by the San Antonio Public Service Company, which included the Comal plant, pursuant to said Arts. 1111–1118, the contract of purchase under which the properties were acquired embraced the provisions of said Arts. 1111–1118 just as surely and completely as though they were written into the deed of conveyance, as a part of its terms. Andrus v. Crystal City Co., Tex.Civ.App., 253 S.W. 557 affirmed, Tex.Com.App., 265 S.W. 550; Empire Gas & Fuel Co. v. State, 121 Tex. 138, 47 S.W.2d 265; Stanolind Oil & Gas Co. v. Terrell, Tex.Civ.App., 183 S.W.2d 743, writ denied. Therefore, though the City acquired the fee simple title to the properties, the power of its governing body to sell or lease said property was strictly limited by the provisions of said articles.

By the terms of said Art. 1112, before any part of a municipal light plant purchased pursuant to said Art. 1111, can be sold by a municipality, the sale must be authorized by a majority vote of the qualified voters of the city. Said article provides that such municipal light plant shall not be encumbered for more than $5,000, except for purchase money, without like authorization. It is undisputed in the record that the lease and option to buy the Comal plant which was given the Blanco Authority by the governing body of the City of San Antonio was not authorized by a majority vote of the qualified voters of the City. In the absence of such authority there can be no authority for leasing said property for a period of 30 years with an option to purchase said property, under the rule announced under the City of Dayton v. Allred, supra, which holds unequivocally that a lease of property is an encumbrance thereof within the meaning of said Art. 1112. It follows that, upon its face, the lease-option contract was void. With-

out taking up, severally, each of the three other contentions of appellants which we have enumerated above, concluding with No. 4, what has just been said sustains equally all of these contentions.

Appellees base their contention that Art. 1112 has no application to the lease-option contract given by the governing body of the City of San Antonio to the Blanco Authority on the ground that the Comal plant formed no part of the municipal plant at the time the deed to the properties was delivered to the City. They contend that the Comal, plant was not purchased as a part of the municipal plant, and that the lease contract with the option to buy clearly indicated that the Comal plant was never a part of the properties purchased. They urge that, before the deed was delivered, it was agreed between the City and the Blanco Authority that the Comal plant formed no part of the municipal plant, and that it should not be acquired by the City as such except as a conduit to subject it to the lease-option contract in favor of Blanco Authority.

Another pillar on which they base their contention that Art. 1112 has no application to the lease of the Comal plant by the governing body of the City to the Blanco Authority, is the claim that the City never in fact acquired the title to the Comal plant, and hence the limitation embodied in Art. 1112 was not violated. Their basis for this contention is the fact that, in contemplation of law, the deed, indenture, and the lease-option contract were delivered so as to constitute them different parts of the same transaction, and that the different instruments must be construed together to reconcile them and make the provisions of each instrument valid. If it were possible to read out of the deed the provisions of Arts. 1111–1118, pursuant to which the City necessarily acquired the utility properties under the deed, it would be unnecessary to hold that title to the Comal plant never vested in the City in order to sustain appellees' contention. The contention of appellees cannot, we think, be sustained.

■ There is no doubt but that a sui juris person can bind himself by contract before he acquires land that, when he acquires title thereto, such land will become subject in his hands to a written contract of lease with option to purchase the fee upon the termination of the lease. The reason for this is that a natural person, sui juris, has the unquestioned power after he acquires land to lease it, with an option in the lessee to purchase upon the expiration of the lease. But a city purchasing property under said Arts. 1111–1118 must act through a governing body with powers limited by said articles. The governing body cannot circumvent the limitations upon its power to bind the City, by making an agreement prior to the acquisition of property which will bind such property which the City is to acquire, where said governing body lacked power to make such a contract binding on such property after the City acquired it without complying with the provisions of the articles pursuant to which the properties were acquired.

■ The Comal plant was, as a matter of law, acquired under Arts. 1111–1118, and said Comal plant was, in our opinion, as a matter of law, acquired as and for the City's municipal electric system. We hold that, as a matter of law, the lease-option contract was void.

Appellees urge that the City is estopped from questioning the validity of the lease-option contract on principles of res judicata, and judicial and equitable estoppel. The basis for their claim is that the Blanco Authority had certain priority rights to acquire the Comal plant which antedated the deed from the San Antonio Public Service Company to the City. The claimed priority rights are:

1. The approval by the Board of Water Engineers of the State of a plan of development on the Guadalupe River which included the acquisition of the Public Service Company's properties.

2. The filing of condemnation proceedings by the Blanco Authority on July 10, 1942.

3. That the Comal plant was located in the district of said Authority.

4. Res judicata based upon the dismissal of the various suits by the Authority against the City.

Appellees do not claim that they had any vested right in the Comal plant prior to the execution of the lease contract. In support of their claim of possessing prior right to acquire a vested right in the Comal plant, appellees rely on such cases as City of Galena Park v. City of Houston, Tex.Civ. App., 133 S.W.2d 162, (writ refused). The City of Houston, in the exercise of its legislative power, extended its boundaries to include a strip of land 5,000 feet wide along Buffalo Bayou for several miles, the strip

having the Bayou as its center. Subsequently the City of Galena Park, in the exercise of its legislative power, attempted to annex a portion of the strip which Houston had annexed. The City of Houston acquired no property rights by extending the area in which it exercised its govermental powers, and in so extending the territory over which it had authority to exercise governmental power, it acquired no right of action or equity which, if pursued to judgment, would become a vested property right. We think the case is not in point.

No doubt in a proper case, with respect to private property which is subject to condemnation for a public use, the first litigant who files a proper suit acquires the prior right to condemn the property. But we think we need not stop to inquire who first filed condemnation proceedings, or whether property which had already been appropriated to the use for which it was sought to be condemned, was subject to condemnation, or whether the Blanco Authority had filed a suit which could result in divesting the Public Service Company of the title to its properties, and vesting title in itself. The most that the Blanco Authority could claim, by reason of having dismissed such a suit upon the agreement of the City to make the lease contract agreement, is that the City is estopped to deny the validity of said lease-contract agreement made by its governing body. It is elementary that a City cannot be estopped by an agreement which its governing body had no legal power to make.

The City was not barred by res judicata to assert the invalidity of the lease contract by reason of the dismissal of any of the Blanco Authority's suits, for the reason that its validity was not an issue therein. Moore v. Snowball, 98 Tex. 16, 81 S.W. 5, 66 L.R.A. 745, 107 Am.St.Rep. 596. The City was not estopped by such dismissal, the dismissals were made on agreement of counsel, and merely showed the suits were dismissed. "* * * to operate as an estoppel against a party to a judgment, the decision must be of a fact directly involved in and necessary to the determination of the issue presented to the court." State v. O'Connor, 96 Tex. 484, 492, 73 S.W. 1041, 74 S.W. 899.

The case of Security Trust Co. v. Lipscomb County, 142 Tex. 572, 180 S.W.2d 151, does not apply here. The question of the validity of the lease contract was never put in issue in any suit before, and the jurisdiction of no court, prior to this suit, has ever attached wherein it was attempted to decide whether same was valid,—either to decide same rightly or wrongly.

If we are correct in our conclusion that the attempted lease and option contract executed by the governing body of the City was void under Arts. 1111–1118, no purpose would be served in discussing other grounds upon which the City urges relief there against.

The court below should have instructed the jury to return a verdict in favor of the City and against the appellees, and rendered judgment that the purported contract of sale and lease between the City and the Blanco Authority was void; and rendered judgment that the assignment thereof, and the ordinance under which the City joined in the execution of said assignment, was void, and further rendered judgment that the City is entitled to enjoy the right of possession of the Comal plant free from any interference by the Blanco Authority and the Colorado Authority.

The Board of Trustees for the Bondholders sought a judgment declaratory of their rights and duties only in event the sale and lease contract was upheld as valid. It follows that their request for such judgment passes out of the case.

The judgment of the trial court is reversed and judgment is here rendered for the City as above indicated.

Reversed and rendered.

T. H. CODY, J., concurs.

GRAVES, Justice (dissenting).

To at once concrete the controlling differences that give rise to the dissent, they are thus set out, under enumeration:

(1) The evident inability of the parties themselves to agree on what were the facts leading up to and through this trial in court has apparently alike affected the members of this reviewing tribunal. Appellants, as self-styled, that is, the City and its two Boards of Trustees, termed by it "The Board" and "The Board of Mortgage Trustees", respectively, the former being, however, only its agent, and the latter its assignee, have plainly, as the record shows, mistaken, misconstrued, and misapplied the conclusively-established and determinative facts underlying the whole controversy; in consequence, they have founded their attacks on the judgment rendered upon er-

roneous assumptions of things that do not exist as facts.

In demonstration of that—as well as in support of these succeeding conclusions, in limine, there is appended hereto as permeating part hereof, marked "Exhibit A", a summary of what are asserted to have been such actual facts, from the inception of this enterprise in 1941, following the order of the United States Securities and Exchange Commission directing the Holding Company thereof to dispose of the San Antonio Public Service Company's stock, up to and through the execution and delivery between these litigating parties of the lease-contract here involved, to-wit: Exhibit A.

(2) The lease-contract between the City and the appellees, of October 24, 1942, the effort to cancel which constitutes the sole objective of the City's suit, on the principal ground that it was void as being beyond the power of the City to make, has heretofore been held by the San Antonio Court of Civil Appeals, in Guadalupe-Blanco River Authority v. Tuttle, Tex. Civ.App., 171 S.W.2d 520, writ of error dismissed for want of merit, 141 Tex. 523, 174 S.W.2d 589, to be legal and valid in all respects. That judgment, although rendered by a divided court, has not been authoritatively overruled, both the Court of Civil Appeals and the Supreme Court therein holding, however, that the one necessary issue on that appeal, as presented, was whether or not such "Board of Trustees" had the right to bring the suit as an independent party thereto; they both held it did not have, since it was, at most, a mere agent for the City.

Thus a direct conflict as to the validity of the contract in suit has been created between the holding of this court and that of the San Antonio Court of Civil Appeals.

(3) As thus finally determined in the Tuttle case, that Board of Trustees had then and has now no standing as the independent party it still assumes to be in this cause—its position being solely that of an impotent agent of the City.

The same status, it is thought, should be given the other Board, that is, the "Board of Mortgage Trustees", composed of one foreign corporate and one individual member, since both also were the mere creatures or alter egos of the City, being named by it as the assignees of its revenue bonds, with which the lease-contract had to do; hence they, too, were only aid-

societies for the City. The individual had no power under the "Indenture", and the Bank had no permit to do business in Texas, hence neither was entitled to any independent or affirmative relief. Article 1536, R.C.S.1925, Vernon's Ann.Civ.St. art. 1536; 11 Tex.Jur., 171, §§ 497 and 195; Pratt-Hewit Oil Corp. v. Hewit, 122 Tex. 38, 52 S.W.2d 64; Texas & P. Ry. Co. v. Davis, 93 Tex. 378, 54 S.W. 381; Real Estate-Land Co. v. Dildy, Tex.Civ.App., 92 S.W.2d 318.

(4) So that, the City's suit herein, under correct appraisement of the undisputed facts so underlying and constituting the basis of its institution and prosecution, would appear to have been nothing more nor less than a belated and seemingly barefaced effort on its part (seeking to retain all benefits while renouncing all obligations thereunder) to repudiate its solemn contract with the appellees, entered into and carried out, up to that moment by the acknowledgment of both sides thereto, in good faith, without a claim by either of any invalidity therein. (See 171 S.W.2d 520, 525, and 174 S.W.2d 589).

Courts of equity will not order cancellation in such circumstances; Lasater v. Premont, Tex.Civ.App., 209 S.W. 753 (writ of error refused); Monroe v. Buchanan, 27 Tex. 241; Doty v. Barnard, 92 Tex. 104, 47 S.W. 712.

(5) The gravamen of this tardy litigious claim for invalidity—that the enterprise so forming the sole subject-matter of the lease-contract, was originally entered upon by virtue of the authority of R.S. Articles 1111–1118, inclusive, Vernon's Ann.Civ.St. arts. 1111–1118, and thereafter pursued as being in compliance therewith until it was so belatedly discovered by the City that such undertaking was—instead—in violation of those articles, in that the City had never possessed the power under those statutes to so proceed—is a mistaken application of the public policy declared therein to facts like these; that is, they plainly have to do only with electric lighting and power plants already existent, but did and do not in any way curtail or prevent the exercise of the City's otherwise existing power under them, as well as under other applicable state statutes and its own charter provisions, to buy and pay for such electrical properties as it so contracted to do in this instance.

"The decisions referred to by the appellants, such as City of Houston v. Allred,

123 Tex. 334, 71 S.W.2d 251; City of Houston v. Mann, 139 Tex. 640, 164 S.W. 2d 548; City of Dayton v. Allred, 123 Tex. 60, 68 S.W.2d 172; Radford v. City of Cross Plains, 126 Tex. 153, 86 S.W.2d 204; Waterbury v. City of Laredo, 68 Tex. 565, 5 S.W. 81; and Moore v. Gordon, Tex.Civ. App., 122 S.W.2d 239, are good law, but they pertain to attempted incumbrance of property already owned by a city." [Brief, page 168.] Whereas this contract dealt only with property thereafter to be acquired. Charter of the City of San Antonio, § 97; City of Austin v. McCall, 95 Tex. 565, 68 S. W. 791; McQuillin, Municipal Corporations, 2d Ed., vol. 3, pp. 1001, 2.; City of Wichita Falls v. Bruner, Tex.Civ.App., 165 S.W.2d 480, writ refused.

In other words, "The River Authorities do not 'claim under the title of the City', but the parties, the City and Guadalupe Authority, expressly contracted that the properties covered by the Contract would be acquired by the City, subject to the. outstanding property rights recognized by the Contract to be in Guadalupe Authority." [Brief, page 172.]

(6) While, as indicated, R.S. Articles 1111–1118 did not forbid nor deny to a City full power to make and carry out such a contract as this one, neither has any other law or authoritative court-holding been pointed out that does; on the contrary, as recited, the very question upon this contract—it is submitted—has been correctly determined adversely to the City by the San Antonio Court of Civil Appeals in the Tuttle case, which holding is at least persuasive upon this court.

(7) Still, were it otherwise, and could it even be said that the attacked contract was ultra vires its powers, the City—by every rule of res judicata, and the binding character of both private and quasi-public contracts, as well as the judgments of courts of record thereon, especially against the collateral attack made here—is estopped, at this late date, to assert or interpose any such claim of immunity. See authorities next cited, infra, under paragraph (8).

(8) Indeed, the City, in this special instance, was acting strictly in its proprietary rather than in its governmental capacity, hence in the courts of the state, to which it so took recourse in the effort to nullify its contract, it had no more rights nor privileges than any other individual ' or private litigant; City of Crosbyton · v.

Texas-New Mexico, etc., Tex.Civ.App., 157 S.W.2d 418, writ refused; City of San Angelo v. Deutsch, 126 Tex. 532, 91 S.W. 2d 308.

Certainly, as such a suitor, it could be estopped the same as any other in like surroundings, even by an agreement which it had originally had no legal power to make, where, as abundantly shown here, it had, in proceedings to carry out the same, so misled the opposing parties and the courts to which it later appealed, that it could neither return the advantages it had received from 'the formers' performance, nor undo the dislocations and implications its contrary attitude had brought upon those courts. Security Trust Co. v. Lipscomb County, 142 Tex. 572, 180 S.W.2d 151; City of San Angelo v. Deutsch, 126 Tex. 532, 91 S.W.2d 308; Smith v. Chipley, 118 Tex. 415, 16 S.W.2d 269; Hitchcock v. Galveston, 96 U.S. 341, 24 L.Ed. 659; City of Galveston v. Loonie, 54 Tex. 517;. Bond v. Terrell, 82 Tex. 309, 18 S.W. 691.

(9) The indisputable proof—the recitations of the lease-contract itself—show that the City acquired the properties of .the Public Service Company subject to 'then admittedly-outstanding claims, titles, and rights therein of the Blanco Authority; wherefore, those properties not: only never became any part of 'the City's electric system, but that contract itself, in essence, being executory in nature, was clearly not only subject to sale by it in whole or in part, without the necessity of a vote of the people thereon, but also constituted a part of the purchase money paid by the City for the properties; therefore, R.S. Articles 1111–1118 not only did not forbid such acquisition by the City without a popular vote, but contained no limitation at all against it. Guadalupe-Blanco River Authority v. Tuttle, Tex.Civ.App., 171 S. W.2d 520; McQuillin Municipal Corporation, 2d Ed., vol. 3, p. 1034; DeMotte v. Valparaiso, 161 Md. 319, 67 N.E. 985, 66 L.R.A. 117; 38 Am.Jur. 257; Wilder v. American Produce Co., 138 Tex. 519, 160 S.W.2d 519.

(10) Especially is it herein held that the City was, first, estopped by its contract along with its performative action thereunder, and, second, by its compromise agreement with all parties concerned, inclusive of the San Antonio Public Service Company—then owner of all the properties involved—and that court itself, which culminated in the settlement and dismissal of

cause No. 3569, in the district court of Comal County.

That judgment of dismissal unlocked the log-jam of litigation and legal impasse the parties had brought upon themselves, in effect dissipated all their differences, and bound them all, including their privies in both contract and estate. It originated out of, was based upon the lease-contract, was not appealed from, and therefore became—as between all such enumerated parties thereto—a final judicial determination not only of the validity of the contract itself, but also that all matters contemplated in their agreement, in response to which it was rendered, had been fully settled. The suit at bar was not one to set aside that judgment—contrarily, it was at most only a belated collateral attack thereon, in a new pleading challenging the validity of the lease-contract, filed by the City in a different district court of Texas, on October 27 of 1943, immediately after the Supreme Court had finally decided Guadalupe v. Tuttle, 174 S.W.2d 589, supra.

Moreover, that judgment on its face thus recited that such parties were before the court and had then and there so agreed:

"* * * and the defendants having also appeared, and all parties having agreed in open court that the order prayed for by the plaintiff should be entered." Stephenson v. Gaines, Tex.Com.App., 298 S.W. 401; Security Trust Co. v. Lipscomb County, 142 Tex. 572, 180 S.W.2d 151; State v. Cloudt, Tex.Civ.App., 84 S.W. 415; Turman v. Turman, 123 Tex. 1, 64 S.W. 2d 137; Provines v. Bell, Tex.Civ.App., 83 S.W.2d 1050, writ dismissed; Herman, Estoppel and Res Judicata, vol. 1, p. 296; Freeman on Judgments, 5th Ed., vol. 1, p. 665, and vol. 2, p. 1596; Ellis v. Mills, 28 Tex. 584; Crawford v. McDonald, 88 Tex. 626, 33 S.W. 325; Cano v. Cuellar, Tex. Civ.App., 95 S.W.2d 155, writ refused; Pope v. Powers, 132 Tex. 80, 120 S.W. 2d 432; Smith v. Cook, Tex.Civ.App., 126 S.W.2d 1049, writ dismissed; Cook v. Burnley, 45 Tex. 97; Davis v. Schaffner, 3 Tex.Civ.App. 122, 22 S.W. 822.

(11) None of appellants' other asserted grounds for invalidity of the contract are considered to have been sustainable in the given state of this record. Especially without merit was its charge that it had been induced to enter into the contract by fraudulent misrepresentations, since its evidence wholly failed to raise an issue of fact upon any such question.

It is the same with reference to its complaint that the transaction was an unconscionable one, since the undisputed evidence—in fact the City's own admission—showed that at the date of this trial it had been making, as a result of this contract, more than $2,000,000 net profit per year, when it had never spent $1 of its money, nor pledged its credit for any amount whatever, to obtain such benefits.

Nor, finally, did the contract unreasonably restrict the area to be served by the City, nor create a monopoly in the appellee-Authorities.

## EXHIBIT A.

Condensed, and copied with approval, from appellee Lower Colorado Authority's brief, by W. S. Gideon, filed in Court of Civil Appeals April 22, 1945.

"Summary of Facts from Beginning in 1941 through Oct. 24, 1942.

"(a) In 1941 the Securities and Exchange Commission of the United States ordered the Holding Company of San Antonio Public Service Company to dispose of its properties. A representative of the Guadalupe Authority went to the Mayor of the City in 1941 and suggested that the City and the Authorities, one or more of them, see about buying these properties. The Mayor told him that the City was not in the mind to purchase it; that the City was not utility minded. So the Authorities proceeded to investigate the possibility on their own account. It developed that the properties of the Company must be sold as a unit, so the Colorado Authority withdrew, because of a limited bonding capacity. The Colorado Authority informed Guadalupe Authority that it would be glad to cooperate with said Authority in the future, if it was found to the best interest of the public. .

"(b) The interest of the Colorado Authority was three-fold. First, by having a joint operation of the Comal Steam Plant with the hydro properties of the Authority, an additional block of power, estimated at 40,000 kilowatt, would immediately be made available for the War effort. It is from the sale of this additional power that the 'profits' which will be realized by the two Authorities, will come; and these 'profits' won't be made, except that there be joint operation of the said properties.

130

Second, to have and operate a steam plant in conjunction with hydro plants, results in greater efficiency and thereby greater benefits to the public. Third, the Authority owned electric properties in Kerr County and served the City of Fredericksburg. It did not own transmission lines to these two points.

"(c) The Guadalupe Authority had proceeded to negotiate for the properties during the spring of 1942, after being informed by the Mayor of the City that the City was not interested in the properties.

"On May 11, 1942, the Guadalupe Authority, having reached an agreement with the representatives of the Holding Company as to price of the Public Service Company's properties, adopted a plan of procedure whereby the electric properties of the Public Service Company would be acquired and the benefits derived therefrom given to the public throughout the Guadalupe River Valley in the form of flood control and conservation of water for irrigation. The plan was filed with the Board of Water Engineers of Texas.

"(d) The City filed a protest with said Board of Water Engineers on May 29, 1942.

"(e) The Board of Water Engineers heard the protest of the City and after full hearing, duly approved the plan. The City filed a suit in a district court of Travis County, seeking to set aside this order of the Board of Water Engineers. Upon hearing, the district court dismissed the suit. The City appealed from the order of dismissal, and after the Contract of October 24, 1942, it abandoned its appeal.

"(f) The President of the Holding Company, upon being contacted by the City, told the Mayor that the City was too late; that the Holding Company had received a satisfactory offer from the Guadalupe Authority. Thereupon the Mayor of the City told the President of the Holding Company that the City was going to file a condemnation suit to prevent the sale going through to Guadalupe Authority.

"(g) The suit to block the trade negotiated by Guadalupe Authority was filed by the City on June 9, 1942, the following day; another suit designed to block the trade of Guadalupe Authority, such suit being the contest of the action of the Board of Water Engineers approving the plan of acquisition of said properties filed with said Board by the Guadalupe Authority, was likewise filed by the City on June 9, 1942, the following day. These two suits were the first suits filed by anyone in connection with the subject matter. Later many other suits were filed; but the City filed the first two suits for the admitted purpose of trying to block the trade already made with the Guadalupe Authority.

"(h) Then on June 15, 1942, the City entered into a contract with bankers and brokers whereby said parties agreed to assist the City in blocking the trade of 'other interests'.

"(i) Thereafter, without any reason being announced then or since, the Holding Company, on July 9, notified the Guadalupe Authority that it was backing out on its trade. On the following day the Guadalupe Authority found that it was necessary to institute suits to protect the trade it had already made. In addition to electric properties, the Public Service Company owned two hydro plants and water rights on the Comal and Guadalupe Rivers, the acquisition of which was practically essential to any water control and conservation program of the Guadalupe Authority. The people in the nine counties outside of Bexar County had no agency except the Guadalupe Authority, to represent them and seek to retain for their benefit, and the benefit of said area, some of the profits that would be realized from operating the electric properties in the nine counties outside of Bexar County. The Guadalupe Authority Board authorized the filing of two condemnation suits, one in Hays County and one in Comal County. They were filed on July 10, 1942.

"(j) On July 13, 1942, the Guadalupe Authority, for the very purpose of trying to have determined whether it, or the City, had the prior and superior right to acquire the properties, all or any part, brought a suit in the District Court of Comal County, being cause No. 3569. Then on July 10, 1942, the City filed another condemnation suit in Comal County, alleging it couldn't agree with the Public Service Company as to price. On the day before the City had signed a letter of purchase with the Holding Company, which letter purported to grant to the City the option until December 1, 1942, to purchase all the outstanding common stock of the Public Service Company. The City also agreed that the revenue bonds it proposed to issue would be delivered by October 26, 1942.

"(k) The petition in its suit No. 3569 set forth in brief the claims of the Guadalupe Authority; it alleged that the City was

likewise claiming rights of acquisition; it alleged that the Authority's rights were prior and superior to those of the City; and plaintiff prayed for temporary injunction, and permanent injunction, establishing the prior and superior rights of the Guadalupe Authority, and for all other relief, general and special, at law and in equity.

"(1) On the 7th day of August, 1942, nearly one month after the Guadalupe Authority filed said suit in the District Court of Comal County, the Public Service Company filed a suit in the District Court of Bexar County, alleging that the claim of the Guadalupe Authority constituted a cloud on the title of its properties, preventing it from disposing of same; it alleged that both the City and the Authority were asserting superior rights of acquisition, and prayed that the cloud on the title be cancelled, and that the court determine which had the superior right. It was a similar suit to the one already on file in Comal County, and it involved identically the same property, and the same issues in general.

"(m) Having successfully blocked the efforts of Guadalupe Authority to get the prior-right question decided, the City set out to seek a compromise of this litigation.

"(n) As a result of its desire to compromise, it was agreed that the City would acquire, subject to certain titles and rights recognized to be in the Guadalupe Authority, specified properties of the San Antonio Public Service Company. The contract of October 24, 1942, which the City now seeks to repudiate, embodied the compromise agreement. Upon its execution, duly authorized by Ordinance, and delivery by the City, Guadalupe Authority agreed to dismiss the pending litigation, including cause No. 3569, in the District Court of Comal County. The Judge of the District Court of Comal County was informed that the parties were contemplating a settlement and compromise of the litigation, and particularly of the issues involved in cause No. 3569; he was informed that if the settlement was consummated, he would be presented with an agreed order of dismissal in cause No. 3569. The settlement was consummated, the Judge was presented with the agreed order of dismissal, he entered the order, which recited that the Guadalupe Authority, the City and its officials, and the Public Service Company, had all appeared in open court and agreed to the order of dismissal. Said Cause No. 3569 involved identically the same property, and addition-

al property, as is involved in the contract of October 24, 1942; and the District Court of Comal County, by virtue of said cause No. 3569, had jurisdiction of the subject-matter of and jurisdiction of the parties to the Contract of October 24, 1942, which Contract was executed in settlement of the issues involved in said cause No. 3569.

"(o) After the order of dismissal was entered, the City represented to the Attorney General of Texas that the matters in dispute and involved in litigation between the City and Guadalupe Authority had been settled; and the City signed and presented to the Attorney General a No-Litigation Certificate, in order to get the Attorney General to approve the bonds being issued by the City.

"(p) The Contract was thus made and entered into with full knowledge on the part of the prospective buyers of all the revenue bonds the City proposed to issue. A syndicate of bankers was going to purchase all of said bonds. So far as the record discloses, said parties still own and hold all of said bonds. A representative of said prospective buyers was present when the proposed Contract was discussed on October 22, 1942, and the final clauses agreed upon. The bankers would not buy the bonds until the Contract was signed and delivered and the pending suits were dismissed.

"(q) Said bankers were present at the closing on October 24, 1942, when the Contract was signed and delivered, before the bankers were called upon to purchase the bonds. After the execution and delivery of the Contract and the dismissal of said suits, Mayor Quin announced that he was ready to sign or had signed and was ready to deliver the certificate that no litigation was pending, and the Assistant Attorney General announced that the opinion of the Attorney General on the proposed revenue bonds would be released; and then either Mr. Matter or Mr. Mayland announced that the opinion of Chapman & Cutler approving the bonds was ready to be released, and after all these announcements, made at the closing, at which time and places there was present: (1) Mr. Glow, representing the Mortgage Trustees, (2) two members of the law firm of Chapman & Cutler, which firm is representing the Mortgage Trustees in this suit, (3) the Mayor and other representatives of the City, (4) the attorney now representing the Board of Trustees; (5) representatives of the parties, who proposed to pur-

chase and later did purchase the bonds of the City; (6) representatives of the Guadalupe Authority; and (7) representatives of the Colorado Authority; then and not until then, were the bonds sold and delivered and the deed from the Public Service Company delivered to the City."